*1067 OPINION.
ARUndell :
The several issues in this case may be grouped under two heads. In the first group there are the questions of whether Eapp is a transferee of the Empire Company and whether the assessment against his estate was timely made. The second group goes to the amount of the deficiency, it being claimed: (a) That the Empire Company was affiliated with three other companies in that part of 1920 prior to August 10; (b) that invested capital was erroneously reduced by excluding claimed good will and on account of taxes for 1918 and 1919; (c) that the sale of assets by the Empire Company was not taxable; and (d) that if it was taxable it was an installment sale.
The material facts relating to the transferee liability may be briefly restated. In 1920 the Empire Company conveyed a part of its assets to a newly organized corporation in exchange for stock of the latter, which stock, pursuant to an agreement with the Empire Company, was issued directly to the Empire’s sole stockholder, John W. Eapp. The brokerage concern that handled the consolidation agreed to purchase a part of the stock thus acquired by Eapp at a fixed price, which agreement it partially performed.
We think these facts are sufficient to establish liability on the part of Eapp. By the conveyances of the Empire’s assets, that company was left without means of satisfying its tax liability, and the assets taken over by Eapp and the proceeds of those conveyed to a third party, were taken subject to the liabilities of the transferor. Concrete Industries Co., 19 B. T. A. 655. Moreover, under the agreement between Eapp and the Empire Company, the Central stock and the remaining Empire assets were expressly taken by Eapp subject to the Empire’s liabilities.
The Empire Company’s return for 1920 was filed on September 15, 1921. Assessment was made against it on February 20, 1926, which was well within the five-year statutory period. A jeopardy assessment of the Empire Company’s deficiency was entered against petitioner on March 5, 1927, and petitioner was notified thereof by letter of March 22, 1927. The statutory period for assessment against the Empire Company did not expire until September 16, 1926, which was after the enactment of the Eevenue Act of 1926, and the assessment against petitioner having been made within one year thereafter, the case falls within section 280 (b) (1)' of the Revenue Act of 1926, and the assessment was timely made. Louis Costando, 16 B. T. A. 1294; J. A. Kemp, 20 B. T. A. 875.
The amounts and percentages of stock owned by the several stockholders in the Empire Company and the three others with which it claimed affiliation are set out in the findings of fact. The tabula-
*1068 tion sot out shows that the Empire Art Metal Company owned all the stock of the Empire Metal Aircraft Company. On this showing there can be no doubt that these two companies were affiliated and entitled to file a consolidated return. The Empire Company owned no stock in the other two concerns, the Perfection Metal Products Company and Queensboro Trucking Company, and no control on the part of the Empire Company is shown. Accordingly, if these two companies are to be included in the affiliation, it must be under' section 240 (b) (2) of the Revenue Act of 1918. All the stock of the Perfection Metal Products Company was owned by three individuals. These three owned only 85 per cent of the Queensboro Trucking Company stock and 94 per cent of the Empire Company stock. In view of the widely varying percentage of stock ownership and the absence of any showing of control or economic unity, we are of the opinion that respondent’s refusal to allow the affiliation of the Perfection and Queensboro companies with the Empire Company should not be disturbed. Block Street Wharf & Warehouse Co., 2 B. T. A. 183.
The claim for the inclusion in invested capital of the Empire Company of good will in the amount of $90,000 is based on the fact that upon organization Rapp assigned to it a contract for equipment of a building in New York and that after incorporation the company itself obtained a contract for equipping a building in Philadelphia, from both of which contracts it expected to realize substantial profits. The evidence is insufficient to sustain the claim. The ability to secure contracts may in some measure be determined by good will, but the fact that a corporation has two contracts does not establish the existence of that intangible, much less its value. Any profits realized under the contracts would find their way into invested capital through earned surplus.
We further hold, on the same evidence, that there was no error in respondent’s exclusion of $90,000 as cost of good will in determining profit on the sale of the Empire Company’s assets. Whatever assets the Empire Company sold were acquired by it after March 1, 1918, and the basis is therefore cost. What the cost was does not appear from the evidence.
The Empire Company’s return for 1918 was filed June 16, 1919, and the statute of limitations, unless waived, ran against assessment five years later, or on June 16, 1924. Respondent introduced no waivers in evidence and we accordingly hold that the assessment of additional taxes for 1918 made on May 29, 1925, was too late. Under our holdings in Lancaster Lens Co., 10 B. T. A. 1153, and National Products Co., 11 B. T. A. 511, it was error for the respondent to reduce invested capital for 1920 on account of the barred tax for 1918.
*1069 The 1919 return was filed July 16, 1920, and the assessment for that year made on May 29, 1925, was timely. Accordingly, there was no error in reducing invested capital on account of that assessment. Section 1207, Revenue Act of 1926.
The remaining questions have to do with the amount of profit realized by the Empire Company on the sale of assets for the Central Company’s stock. There is no merit in the contention that'the profit should be computed on the installment basis, as the entire consideration, namely, stock of the Central Company, was received at once by the Empire Company. The fact that Rapp received in cash within the year less than one-fourth of the price at which he agreed to sell the stock does not affect the question, as he was not the vendor of the Empire Company’s assets.
Section 202 (b) of the Revenue Act of 1918, under which the profit to the Empire Company is to be computed, provides that:
When property is exchanged for other property, the property received in exchange shall, for the purpo'se of determining gain or loss, be treated as the equivalent of cash to the amount of its fair market value, if any; * * *.
Respondent computed the gain under this section, but in so doing he used $444,843.80 as the sale price and now concedes that that figure is in error in so far as it exceeds the $340,000 shown as the sale price in the return. There is no dispute between the parties that the amount of $187,569.30 listed in the return as the value of assets sold is the correct basic figure — except for the $90,000 good will item eliminated by the respondent, which elimination we have sustained.
The sale price of $340,000 now contended for by respondent represents a value of $85 per unit for the stock received by the Empire Company, each unit consisting of one share of preferred and two shares of common stock. We are satisfied that the figure of $85 per unit is higher than the fair market value. The evidence shows that despite extraordinary efforts exerted by the Geiger-Jones Company, sales were exceedingly slow and in very small blocks. The stock was peddled in three States and common stock offered as a bonus, and yet the sales dwindled with the passage of each month. The stock was not listed and there are no bid or asked prices of record. Banks refused to accept the- stock as collateral. The issuing company, Central, was losing money in 1920. The Geiger-Jones Company was in a bad way financially. The Central Company, it is shown, was tremendously overcapitalized. -The agreement of the Geiger-Jones Company to purchase Rapp’s holdings at a stipulated price is no evidence of market value. The figure agreed upon was purely an artificial price fixed before any market value was established. The widely scattered purchasers of the stock had no knowledge of the value of the stock, and it appears that they were induced to buy *1070 through the efforts of Geiger-Jones salesmen and on the basis of the fictitious statements in the prospectus put out by that company. The sales made, in our opinion, do not establish the fair market value of the stock.
We do not believe that petitioner makes his case solely by establishing that $85 was not the fair market value of the preferred shares. The evidence is all to the effect that Geiger-Jones arbitrarily wrote up the assets and the plant account alone was increased $1,000,000 above its actual worth as a justification for the basis on which the financing of the Central Company was being undertaken. The fact that shares of stock may not be marketed at an excessive price does not establish the lack of a market for the same shares at a fair price. The new company had the assets of two companies that had previously been operating, and, as far as we know, had been successful concerns. The former president of the Zahner Company, who also acted as consulting ■ accountant to the Geiger-Jones Company prior to the consolidation, and who was familiar with the plants and operations of both companies, testified that consolidation would have been an excellent thing for both companies if the capitalization had been kept down to a basis commensurate with the value of the assets, and he expressed it as his opinion that the preferred stock was worth from $25 to $35 per share on the basis of the combined value of the assets of the two companies. Upon careful consideration of all of the evidence we feel warranted in fixing a fair market value on the preferred stock, and in our opinion its fair market value was not in excess of $50 per share. It follows that the amount realized by the Empire Company on the exchange of its assets for stock should be computed on that basis.

Decision will be entered under Bule 50.