Elsie L. Dees, et al. [1] v. Commissioner. Dees v. Commissioner
Docket Nos. 81908-81910, 82404.
United States Tax Court
T.C. Memo 1962-153; 1962 Tax Ct. Memo LEXIS 152; 21 T.C.M. (CCH) 833; T.C.M. (RIA) 62153; June 26, 1962
*152 Donald L. Wilson, Esq., Robert Mueller, Esq., Perry Brooks Bldg., Austin, Tex., A. E. Brooks, Esq., Fort Worth Nat'l Bank Bldg., Fort Worth, Tex., and K. G. Tarlton, Esq., for the petitioners. E. John Eagleton, Esq., Roy E. Graham, Esq., and Allen T. Akin, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income tax of W. W. Dees and Elsie L. Dees in the amounts of $36,972.62 and $88,692.63 for the years 1953 and 1954, respectively, and additions to the tax for 1953 under section 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939 in the respective amounts of $3,646.80 and $2,431.18. For 1955 respondent determined a deficiency in income tax of W. W. Dees in the amount of $7,359.37 and a deficiency of the same amount in the income tax of Elsie L. Dees. Respondent determined a deficiency in the income tax of William Angus Wages and Mildred Wilma Wages for 1954 of $11,368.88. W. W. Dees and Elsie L. Dees each claim an overpayment of income tax for the year 1955 in the amount of $463.10, and for the year 1954 W. W. Dees and Elsie L. Dees claim an overpayment of income tax in the *153 amount of $360. Some of the issues raised by the pleadings have been settled by the parties, leaving for decision herein the following: (1) Whether W. W. Dees and Elsie L. Dees realized income in the years 1953 and 1954 from the purchase of Western Republic Life Insurance Company stock at less than the fair market value thereof. (2) What was the fair market value of Western Republic Life Insurance Company stock on December 21, 1953, and April 21, 1954? (3) Whether W. W. Dees and Elsie L. Dees realized income of $1,350 in 1955 through the purchase of land from Western Republic Trust Company at less than its fair market value. (4) Whether W. W. Dees received, in 1955, as compensation for services rendered to Western Republic Life Insurance Company one block of 600 shares of that company's stock. (5) Whether W. W. Dees and Elsie L. Dees realized income of $16,812.50 by transferring 1,000 shares of Western Republic Life Insurance Company stock to Horace E. White in part payment of the purchase price of land. (6) Whether W. W. Dees and Elsie L. Dees sold 200 shares of Western Republic Life Insurance Company stock to Frank Griffin in 1955. Findings of Fact Some of the *154 facts have been stipulated and are found accordingly. Petitioners W. W. Dees and Elsie L. Dees, husband and wife residing in Brownwood, Texas, filed joint income tax returns for the taxable years 1953 and 1954 and separate income tax returns for the taxable year 1955 with the district director of internal revenue at Dallas, Texas. Petitioners William Angus Wages and Mildred Wilma Wages, husband and wife residing in Austin, Texas filed a joint income tax return for the year 1954 with the district director of internal revenue at Austin, Texas. W. W. Dees (hereinafter referred to as petitioner) during the years here involved, was president of the Citizens National Bank in Brownwood, Texas. Sometime in 1952 or prior thereto, Banks L. Miller (hereinafter referred to as Miller) contacted petitioner and William Angus Wages (hereinafter referred to as Wages) to discuss the formation of an insurance company. Miller had formulated a plan for organizing a life insurance company and believed petitioner possessed the experience and reputation in the banking business and Wages the experience in the insurance business, necessary to the successful formation of such a company. Miller, Wages, *155 and petitioner discussed the different plans and problems attendant upon forming an insurance company, and it was decided that they would proceed with the establishment of such a company. In furtherance of this plan three corporations were organized. Western Republic Life Underwriters (hereinafter referred to as Underwriters) was organized on November 6, 1952, Western Republic Life Insurance Company (hereinafter referred to as insurance company) in March 1953, and thereafter, Western Republic Trust Company (hereinafter referred to as trust company). The function of Underwriters was to raise funds with which the insurance company would be capitalized, enabling the latter to start insurance operations. Underwriters was to raise the funds with which to purchase insurance company stock through the public sale of both its own stock and the stock of insurance company. Insurance company was formed and operated as a stock insurance company engaged in the business of selling insurance. Trust company was set up to stabilize the market for insurance company stock during the time of the public offering thereof by Underwriters. Trust company would purchase shares of insurance company stock at *156 the public offering price from brokers and stock purchasers desiring to sell to prevent the stock being sold by newspaper advertisement or otherwise at less than its public offering price. Miller was president of all three corporations. Petitioner was chairman of the board of directors of insurance company. Wages was vice president and on the board of directors of insurance company. Underwriters, organized under article 1303(b) of Vernon's Annotated Statutes of the State of Texas, was a licensed securities dealer and as such could license agents or other security dealers to sell any security it was handling. It had capital stock of 100,000 shares, divided into 50,000 shares of no par common stock and 50,000 shares of no par class A common stock. Twenty-five thousand shares of its common stock were issued for $25,000, which constituted its initial paid-in capital. By December 31, 1953, 49,400 shares of Underwriters common stock were outstanding for which $52,150 or an average per share amount of $1.06 had been paid. On December 31, 1953, Miller, his wife, Zella Miller, and his son, Banks Miller, Jr., together held 44,700 shares; Wages held 2,500 shares; and petitioner held 500 shares *157 of Underwriters common stock. About the first of March 1953, Underwriters began the public promotion of its class A common stock. On cash sales the price was set at $16 per share. On subscription contract sales, payable over 3 years, the price was set at $20 per share. These prices were arrived at by the Securities Commissioner in consultation with Underwriters' officers. The net to Underwriters from such sales was $12.80 per share whether from cash or installment sales. Underwriters employed 18 agents in 1953 for the sale to the public of its class A common stock and later employed 18 additional agents to sell insurance company stock. Underwriters sold and issued to the public 24,900 shares of its class A common stock in 1953, 2,217 shares in 1954, and 59 shares in 1955 for a total of 27,176 shares. In addition, Underwriters sold to the public on 3-year subscription contracts 24,825 shares of its stock in 1953, 605 shares in 1954, and none in 1955, a total of 25,430 shares. The class A common stock sold on these subscription contracts was not to be issued until paid in full. Individuals who were either agents or employees of Underwriters or members of Underwriters' board of *158 directors purchased Underwriters class A common stock on the dates, in the amounts, and for the prices set forth: Date of purchase
Purchaser
No. of shares
Price per share
5/18/53
W. B. Hahn
100
$16.00
6/30/53
George L. Herber
10
16.00
7/ 8/53
A. E. Fulton
400
12.80
8/25/53
W. B. Hahn
50
9/28/53
John Howard Wilkinson
50
12.80
10/ 1/53
Kenneth H. Riley
25
12.80
10/ 7/53
Thelma G. Westbrook
500
12.80
10/13/53
W. T. Mayfield, Jr.
25
16.00
10/15/53
W. B. Hahn
100
12.80
1/ 8/54
Edward S. Gardner
25
12.80
2/10/54
George A. Herber
100
12.80
3/25/54
George L. Herber
25
16.00
5/21/54
Minnie H. Tabor
25
16.00
5/31/54
William T. Mayfield
75
16.00
6/ 2/54
W. L. Muston
5
12.80
7/ 9/54
W. T. Mayfield
25
16.00
On March 4, 1953, when insurance company commenced business, it had capital stock of 2,500 shares of $10 par value, with paid-in capital of $25,000 and paid-in surplus of $12,500. On August 15, 1953, the capital stock of insurance company was increased from 2,500 shares of $10 par value to 10,000 shares of $10 par value, making a total of issued and outstanding capital stock of 10,000 shares, with a paid-in *159 capital of $100,000 and a paid-in surplus of $17,500. Underwriters owned 9,995 shares of the outstanding 10,000 shares. On October 14, 1953, insurance company increased its authorized capital stock from 10,000 shares of $10 par value to 300,000 shares of no par value stock. The outstanding 10,000 shares of $10 par value stock were exchanged for 100,000 shares of no par value stock, and Underwriters at the same time acquired an additional 100,000 shares of no par value stock of insurance company at $1.50 per share, giving insurance company at that time a total of 200,000 shares of capital stock issued and outstanding with a paid-in capital of $250,000 and a surplus of $18,187.61. Underwriters owned 199,950 shares of the outstanding 200,000 shares. On October 14, 1953, there were 100,000 shares of no par value stock of insurance company authorized and not issued. Underwriters, by agreement, undertook to sell 50,000 shares thereof to the public. The promotion by Underwriters of insurance company stock was similar in procedure to the promotion of Underwriters' own class A common stock and this promotion was begun while the promotion of Underwriters stock was still in progress. At *160 the peak of the promotional period Underwriters had about 35 or 36 agents promoting insurance company stock. The agents were located in 22 principal cities in Texas. The agents covered the entire State sooner or later, but operated principally in the more populous areas. The selling was of a high pressure type. The salesmen were equipped with lists showing other people who had bought insurance company stock and data with respect to other successful insurance company ventures and the amount of money which might be earned from such a venture. The salesmen singled out likely prospects and in many instances pursued the prospect assiduously. One prospective customer was approached 15 different times by the same salesman. The salesman made no misrepresentations with respect to the stock. However, many of the purchasers bought the stock having only a sketchy knowledge of the affairs of insurance company. The sales were generally in small lots of 25, 50 or 100-share blocks. The stated selling price for insurance company stock varied between $16 and $25 per share. Most cash sales were at either $16 or $20 per share, and subscription sales were primarily at $20 per share. Salesmen were not *161 permitted to sell insurance company stock to the public for less than $16 per share. Some stock was exchanged for notes, mortgages on land, land, and other property. In making the agreement involving these exchanges, a price for the stock would be set out. It was the arrangement between Underwriters and insurance company that for every share of stock Underwriters sold out of the 50,000 insurance company's shares it undertook to sell, it would remit to insurance company $12.80. The $12.80 figure was set as the amount which would afford insurance company sufficient original operating capital. Of the gross proceeds received on the sale of both Underwriters' class A common and insurance company stock, 25 to 26 percent constituted selling and promotional expense. The subscription contracts contained an insurance feature which would pay the unpaid balance on the subscription contract in the event of the subscriber's death during the term of the contract. The cost of this feature was $4 per share. The contracts between Underwriters and its sales agents provided for commissions of 10 to 12 1/2 percent on subscription sales of both Underwriters' class A common stock and insurance company *162 stock and commissions of 10 to 17 1/2 percent on cash sales of the stocks of each of these corporations. The first share of insurance company stock sold under the promotion by Underwriters was issued on November 18, 1953. Insurance company's books show that in 1953 it issued 1,099 shares of its stock which had been sold at a price of $16 per share. In 1953 Underwriters sold 3,625 shares of insurance company stock on subscription contracts at $20 per share. Insurance company's books show the issuance in 1954 of approximately 29,950 shares of its stock exclusive of sales to petitioner or Wages, most of which was sold for $16 or $20 per share. In 1954 Underwriters sold on the subscription contracts 20,440 shares of insurance company stock primarily at $20 or $25 per share. Insurance company's books show the issuance in 1955 of approximately 1,670 shares of its stock sold for cash, trades, or notes for prices ranging primarily between $20 and $25 per share. The 3-year subscription contracts were paid 25 percent cash down with the balance payable in equal installments of approximately 6 percent each 3 months for 12 quarters. Stock sold on subscription was not to be issued until paid *163 in full. The following individuals who were either agents, employees, or directors of either Underwriters or insurance company purchased insurance company stock from Underwriters at less than $16 per share: Price per
Date
Name
Shares
share
issued
W. Wayne Dees
5,000
$ 1.50
12/21/53
Lovell Rhodes
25
13.20
2/ 5/54
W. Wayne Dees
5,000
1.00
4/21/54
W. Burford Hahn
400
1.50
4/28/54
W. Burford Hahn
50
12.80
5/21/54
W. Angus Wages
2,500
1.50
5/31/54
Mary G. Ruffner
50
12.80
8/10/54
Baxter Edwards
500
12.80
11/ 9/54
George L. Herber
100
1.50
11/23/54
W. Burford Hahn
50
1.50
12/ 7/54
Raymond E. Williams
300
1.50
12/27/54
Thelma G. Westbrook
250
1.50
12/30/54
George L. Herber
175
1.50
1/ 7/55
The following individuals received insurance company stock as a bonus: Date
Name
Shares
issued
James Worley Long, Jr.
10
12/21/53
Jesse M. Johnston, Jr.
10
12/21/53
Walter A. Rogers
5
4/ 2/54
Gordan A. Ray
5
4/ 2/54
James R. Cash
10
4/ 2/54
W. Wayne Dees
3,800
4/21/54
Stanley R. Stout
5
11/ 4/54
Walter R. Luedicke
5
11/ 4/54
Prior to the organization of either Underwriters *164 or insurance company it had been orally agreed between Miller, Wages and petitioner that the latter two would be entitled to purchase a reasonable amount of stock in the insurance company to be formed at the average price paid for the same stock by Underwriters. It was further agreed between these parties that none of them would sell any of their insurance company stock during the promotion period. In pursuance of this understanding on December 21, 1953, petitioner purchased from Underwriters 5,000 shares of insurance company stock for a total price of $7,500 or $1.50 per share. On April 21, 1954, petitioner received 8,800 shares of insurance company stock paying therefor $5,000. Underwriters' records originally reflected this latter acquisition in the following manner: Capital National Bank
$5,000.00
Sales Promotional Expense
9,080.00
Insurance Stock Sales
$14,080.00
On May 31, 1954, a month and a half after petitioner acquired the 8,800 shares of stock, the following corrected entry was made on Underwriters' books: Insurance Stock Sales
$9,080.00
Sales Promotional Expense
$9,080.00
Of the 8,800 shares, 5,000 were purchased by *165 petitioner for $5,000 or $1 a share and the remaining 3,800 shares were received by petitioner without cash payments therefor as additional compensation for services rendered. On May 31, 1954, Wages purchased from Underwriters 2,500 shares of insurance company stock paying $3,750 or $1.50 per share. Underwriters had sold 1,024 shares of insurance company stock at $16 per share by December 21, 1953, the date of petitioner's first purchase, and by that date over 2,450 shares of insurance company stock had been sold on 3-year subscription contracts. After petitioner's shares were issued on December 21, 1953, insurance company had 206,024 shares of stock issued and outstanding, of which 199,950 shares were issued to Underwriters for an average price of $1.25 per share. The total number of shares of insurance company stock issued and outstanding as of December 31, 1953, was 206,114 shares of which number 100,000 shares had been issued for an approximate price of $1 per share; 105,000 shares had been issued for a price of $1.50 per share; and of the remaining 1,114 shares, 1,099 thereof had been issued at the public offering price of $16. At the time petitioner purchased the 5,000 *166 shares on April 21, 1954, insurance company had issued approximately 213,200 shares of stock of which 100,000 shares had been issued for approximately $1 per share; 105,000 shares had been issued for $1.50 per share; and approximately 8,200 shares had been issued on trades, for notes, or cash principally at the $16 per share promotional price. By April 21, 1954, the date of petitioner's second purchase of stock, a total of over 9,050 shares of insurance company stock had been sold on 3-year subscription contracts. After petitioner's stock was issued on April 21, 1954, there were approximately 222,000 shares of insurance company stock issued and outstanding of which 210,000 had been issued at an average price of $1.25 per share; 3,800 were issued for services rendered and of the remaining approximately 8,200 shares, 40 were issued as bonuses and the balance issued for trades, notes or cash at a stated price of $16 per share. Prices for insurance company stock were not quoted in the National Stock Summary Reports (a compilation of bid and ask prices over a period of years) for the years 1953, 1954 or 1955 nor was insurance company written up in Best's Digest of insurance companies. *167 There was no over-the-counter market for insurance company stock. The market for insurance company stock was created by the 35 or 36 agents whom Underwriters sent out over the State of Texas selling such stock on individual solicitation basis. Secondary transfers by holders of insurance company stock were made in 1954 and 1955. In 1954 a total of 798 shares were transferred in 14 transactions. In 1955 a total of approximately 5,155 shares were transferred other than by trust company, Banks Miller and Zella Miller or petitioner, in 90 transactions. During the years 1952 through 1955 there were approximately 200 insurance companies organized in Texas. Consequently the competition for insurance salesmen was strong. In December 1953, insurance company had a rudimentary sales force. Because of the competition for salesmen, insurance company was not able to be as selective in procuring salesmen as it would have been in a less competitive situation. The quality of insurance company's sales personnel in April 1954 was approximately the same as in December 1953. Insurance company competed as a young company for the better agents against larger companies which had more experience and background. *168 On annual statements submitted by insurance company to the Texas Board of Insurance Commissioners for the years 1953, 1954 and 1955 the following information was shown: As of
Shares
Admitted
Stated Non-Ad-
Stated
Stated
Dec. 31
Outstanding
Assets
mitted Assets
Total Assets
Liabilities
1953
206,114
$547,985.25
$360,731.30
$ 908,716.55
$275,652.14
1954
248,568
701,762.30
380,790.45
1,082,552.75
331,660.71
1955
277,710
750,454.16
378,784.39
1,129,238.55
433,386.47
On the basis of these figures the book values per share of stock outstanding on stated total assets less liabilities as of December 31, 1953, 1954 and 1955 are $3.07, $3.02 and $2.50, respectively, and the book values per share outstanding on admitted assets less liabilities at each of these dates are $1.32, $1.49 and $1.14, respectively. On the same annual statements submitted to the Texas Board of Insurance Commissioners the amounts of income, deductions and net gains for the years 1953, 1954 and 1955 are shown as follows: 1953
1954
1955
Premium and annuity considerations
Life
$270,361.09
$157,639.76
$205,486.82
Accident and health
2,506.15
49,829.19
210,880.65
Net investment income
2,555.07
24,292.23
28,414.23
Miscellaneous income
734.00
2,313.86
Total income
$275,422.31
$232,495.18
$447,095.56
Expense
Death benefits
$ 375.00
$ 4,998.50
[ 281.20)
Benefits under accident and health
226.20
19,762.55
110,107.70
policies
Surrender benefits
209.34
Increase in life insurance reserves
254,805.00
34,284.00
63,309.00
Increase in accident and health
834.88
4,938.69
12,630.99
reserves
Commissions
4,146.41
85,307.70
175,781.54
General insurance expenses
54,438.56
321,960.17
400,817.02
Taxes, licenses and fees
1,571.75
8,130.59
15,643.00
Increase in collection costs on
unpaid pre-
miums
8,295.66
44,916.73
(3,302.91)
Total Expenses
$324,693.46
$524,298.93
$774,914.48
Net gain from operations
($ 49,271.15)
($291,803.75)
($327,818.92)
*169 On its Federal income tax returns, insurance company reported a $229.18 loss for 1953, taxable income of $9,640.61 for 1954, and taxable income of $1,698.46 for 1955. Insurance company paid no dividends during any of the years here in issue. By a restrictive agreement with Underwriters, insurance company was prohibited from declaring dividends without Underwriters' consent. Such consent was not granted. On other financial statements of insurance company covering the years 1953, 1954 and 1955, prepared for the information of its shareholders and to show prospective insurance purchasers, the following information was shown: As of
Total
Admitted
Other
Dec. 31
Assets
Assets
Assets
1953
$ 989,614.42
1954
1,456,307.00
$744,342.30
$711,964.70
1955
1,340,900.75
787,454.16
553,446.59
As of
Capital
Insurance
Dec. 31
Liabilities
and Surplus
in Force
1953
$316,463.81
$673,150.61
1954
374,240.71
370,101.59
$13,034,788.00
1955
470,386.47
317,067.69
29,345,224.00
The annual reports filed by insurance company with the Insurance Commission for the State of Texas for the years 1953, 1954, and 1955 show as a nonadmitted *170 asset a note receivable from Underwriters in the changing amounts of $289,500, $132,396.08, and $78,408.31 as of December 31 of the respective years. There was no consideration received by Underwriters for this note. The payment of this note by Underwriters to insurance company was contingent upon the receipt by Underwriters of the proceeds from its promoted sales of Underwriters' Class A common stock. The note was paid off 7 years later, in cash or cash equivalent. Single premium annuities in the total amount of $250,000 were purchased from insurance company during the year 1953, one each by Miller, Wages, and Thelma Westbrook. The $250,000 premium was paid by the individuals obtaining loans on the policies from insurance company, which loans appear in the balance sheet of the company as an asset in the amount of $250,000. The offsetting liability appears on the annual statement in the amount of $250,000 as a reserve for the annuity policies. These policy loans were against an obligation which could be terminated by the insured. These loans and annuity policies were also reported as assets and liabilities as of December 31, 1954 and 1955. By December 31, 1953, insurance company *171 had received life insurance applications in the amount of $2,312,452. The following schedule shows the number and amount of insurance policies outstanding at the start of the year, issued during the year, cancelled during the year, the total in force at year end, and the number and amount of claims on life insurance policies made, all for the years indicated: 1953
1954
1955
No.
Amount
No.
Amount
No.
Amount
Policies in force at
700
$ 1,261,409
2,546
$ 8,258,924
end of prior year
Life insurance
702
$1,296,444
2,747
9,827,385
2,029
7,554,918
policies issued
during year
Total
702
$1,296,444
3,447
$11,088,794
4,575
$15,813,842
Less: Life insurance
2
35,035
901
2,829,870
1,345
5,417,321
cancelled
Total life insurance
700
$1,261,409
2,546
$ 8,258,924
3,230
$10,396,521
in force at year end
Losses and claims
1
375
4
4,998.50
1
218.80
incurred during year
Petitioner in 1954 forwarded to insurance company seven applications for life insurance in the aggregate amount of $48,500. In 1955 petitioner forwarded 19 insurance policy applications in the aggregate amount of $180,000 to insurance company. *172 Petitioner, as a director of insurance company, was prohibited under local Texas law from receiving commissions on the sale of life insurance. Reputable brokers generally did not handle the stock of the approximately 200 life insurance companies formed in Texas in the early 1950's. Life insurance salesmen would obtain security licenses and sell the stock at a price that had been determined by the selling group, or the promoters of the companies and when the promotional stock had been sold, these insurance salesmen would drop their securities licenses and return to selling life insurance. In certain instances, reputable brokers would be approached by stock purchasers who were interested in selling their stock or finding out its true worth. Very few of the insurance companies organized under this high-promotional scheme were successful. After the promoters removed themselves from the picture, most of these stocks dropped back considerably and some were closer to founder's price than to the promotion price. The ratio of the founder's price to the promoter's price was in many instances 18 or 20 to 1. During the years here involved, there was a very limited secondary market for insurance *173 company stocks that were sold by controlled sales organizations. In order to dispose of such stocks, brokers generally would call the company which had issued the stock and ask it to buy the stock back. The officers of insurance company concluded in the latter part of 1954 that it would be necessary to support the promoted price of its stock to prevent a situation from arising that would enable the holders of outstanding subscription contracts to buy the stock at a price considerably less than the promoted contract price. Insurance company did this through trust company. Trust company purchased at least 2,086 shares of insurance company stock from brokers of dissident shareholders and also purchased subscription contracts from persons who needed to sell them. The stock which trust company thus bought was sold by the company through the Underwriters' promotion organization. By a resolution on March 8, 1954, the stockholders of Underwriters adopted a proposed plan of reorganization between insurance company and Underwriters, under the terms of which the holders of both class A common stock and common stock of Underwriters could, after 80 percent of the common stockholders had deposited *174 their stock in trust, exchange each share of their Underwriters stock for two shares of insurance company stock. Persons holding subscription contracts of Underwriters class A common stock could also elect to receive two shares of insurance company stock in exchange for each share of Underwriters' stock they would be entitled to receive upon payment in full of the subscription price. A person paying an average price of $1.06 for a share of Underwriters common stock would get two shares of insurance company stock, and the person paying $16 for a share of Underwriters' class A common stock would receive two shares of insurance company stock. Insurance company stock was issued in exchange for Underwriters stock pursuant to the above-mentioned resolution during July to October 1954. The insurance company stock issued to the surrendering shareholders came from insurance company stock already held by Underwriters. The Underwriters stock which was exchanged for insurance company stock was then issued to insurance company. A new securities law in Texas was passed in September 1955 which changed the requirements for the issuance of security permits to salesmen forcing a clean-up in the *175 security sales business. This stopped insurance salesmen from getting security salesmen's permits. In September of 1955 Underwriters was advised by the Securities Commissioner of Texas that he preferred that Underwriters sell no stock of any corporation that was a new issue. The new Securities Act which became effective in September 1955 made it illegal for any 1303b corporation such as Underwriters to sell any stock which was not registered with the Securities Commission of Texas. During the period September 21, 1955 to December 30, 1955 Banks Miller and Zella Miller sold 3,123 shares of insurance company stock through the Underwriters' sales promotion for approximately $63,462.10, paying 20 percent sales commission. The sales were made primarily in order that Miller would have money to purchase some insurance company revenue bonds from Underwriters. According to the Citizens National Bank ledger sheet the following loans were made by that bank to Underwriters: Date of Loan
Amount
Collateral Given
8-19-53
$35,000
2,495 S/S Western Republic Life Ins. Co.
10-15-53
40,000
199,950 S/S Western Republic Life Ins. Co.
12-29-53
30,000
None
3-27-54
40,000
None
7-30-54
$40,000
199,950 S/S Western Republic Life Ins. Co.
10- 2-54
30,000
199,950 S/S Western Republic Life Ins. Co.
12-28-54
40,000
50 Western Republic Life Ins. Rev. Bds.
3-17-55
30,000
50 Revenue bonds, $1,000 each
9-30-55
35,000
40 Revenue bonds, $1,000 each
*176 The 2,495 shares of insurance company stock given as collateral for the $35,000 loan on August 19, 1953, constituted all but five of the then outstanding insurance company shares. Insurance company had a capitalization at that time of $37,500. The 199,950 shares given as collateral on the $40,000 loan on October 15, 1953 represented the same proportionate interest in insurance company as the 2,495 shares given as collateral on August 19, 1953. Insurance company's capitalization on the latter date was $268,187.61. The loans dated December 28, 1954, March 17, 1955, and September 30, 1955, were secured by revenue bonds issued by insurance company. The bonds were 5 percent revenue debentures secured by a certain percentage of the premiums and income of insurance company. A market had been created to repurchase those bonds at 96 percent in the event the purchaser desired to sell his bonds. Insurance company issued only $200,000 worth of revenue bonds of which trust company bought $100,000 worth. Insurance company maintained an account in the Citizens National Bank, Brownwood, Texas, having the following high, low and year end balances for the years indicated: 1953
1954
1955
High balance
$250,000
$184,613.78
$81,884.68
Low balance
105,000
50,876.93
35,667.57
Year end balance
184,000
80,876.93
56,617.10
*177 Petitioner prepared six financial statements five of which were submitted to either the Continental National Bank or the First National Bank, both in Fort Worth, Texas. On one financial statement dated November 10, 1953, 10 shares of insurance company stock with a total value stated at $100 were listed, the other four statements, two dated November 12, 1954, one dated June 30, 1955 and one dated November 1, 1955, all had listed thereon 5,000 shares of insurance company stock with a total stated value of $80,000. The sixth financial statement was prepared by petitioner on March 18, 1954 on which was listed 5,010 shares of insurance company stock with total stated value of $12,525. On most of the financial statements petitioner listed only about one-third of the insurance company stock which he owned. Petitioner put as a value for the stock a figure he deemed to be reasonable. On these financial statements petitioner omitted other securities which he owned. Petitioner as chairman of the board of directors of insurance company had been authorized a $250 per month salary for 1955 and 1956 but did not receive monthly payment of this salary. In 1955 insurance company was short on cash *178 and Miller asked petitioner if he would accept payment of 600 shares of insurance company stock in lieu of salary for 1955 and 1956. Miller prior to approaching petitioner in this regard had a stock certificate covering the 600 shares set aside pending approval by petitioner and the board of directors of insurance company of the issuance of the stock in lieu of payment of salary by other methods. The requisite consents were given sometime in 1956 and the stock certificate dated August 19, 1955, was issued to petitioner around May 9, 1956. Petitioner did not consider the stock he received equivalent to the dollar salary he was to have received. On August 22, 1955, petitioner transferred 1,000 shares of insurance company stock to Horace E. White as part payment for land. White went to petitioner on different occasions and talked about selling certain land to him. He was trying to sell the property to anyone who wanted to buy it. Petitioner was not interested in buying the land at the price White asked. White had employed an individual named Blake who had engaged in the real estate business in Brownwood for 35 years, to try to sell the land. White was asking $250 an acre for the land, *179 and Blake showed the land several times but never received one offer on it. After White had not been successful in selling the land to anyone else, he went to talk to petitioner about it again. White and petitioner made an agreement whereby petitioner paid White $22,250 in cash, took the property subject to a note with a remaining balance of $15,250, and transferred to White 1,000 shares of insurance company stock, being allowed therefor, for purposes of the trade, $16,812.50. Petitioner did not believe the fair market value of the land was $250 an acre, but rather believed the fair market value was $175 an acre. Neither did petitioner believe the stock was worth the amount he was allowed on the trade. Although White did not evidence any particular knowledge about the financial condition of insurance company, he did not think the stock was worth the amount which petitioner was allowed therefor on the trade. The farm which was conveyed to petitioner by White under deed dated August 1, 1955, contained 217.65 acres of land and the conveyance was made subject to the unpaid balance due and owing on a note in the original sum of $27,500. The White farm was hilly, mesquite land. It was *180 in poor condition at the time petitioner purchased it. It was located near dump grounds and there were several truck loads of rubbish, bottles, cans, automobile tires and other debris scattered over the place. There were bad washes or sloughs on the land. There were dead trees and overflow logs on the land and it was in rough condition. There was an old abandoned dairy barn on the land the roof of which leaked. The barn was a stucco building, about 25 feet wide and 40 feet long. The fences were in bad condition. A nearby stream and bayou had intermittently in the past overflowed on to the land covering the entire acreage. The land was not subject to the overflow every year but had been subject to such overflow as many as three times in certain years. After petitioner acquired the land from White he spent between $21,000 and $22,000 for heavy equipment work leveling the land and pushing off the timber. This occurred in the latter part of 1956, or the early part of 1957. Petitioner has spent approximately $50,000 improving the White farm since his acquisition thereof in August 1955. In 1959 petitioner sold about 20 acres of the White farm for $18,000 or $900 an acre, to a railroad *181 company. On August 9, 1955, petitioner purchased 435.16 acres of land from trust company paying $7,000 cash therefor and taking the property subject to a note and mortgage of $7,650. Trust company acquired the land from individuals named Winn and McMinn on a trade for 1,000 shares of insurance company stock which it held and was trying to sell through the Underwriters' selling organization. The stated value of the stock on the trade was $25 per share. Winn and McMinn had purchased the subject property or 327 acres thereof in two parts, in 1952 and 1954, for $60 per acre or a total cost of $19,620. Prior to the purchase of the land by trust company petitioner wrote a letter to Miller wherein he stated: I ran out and looked over the tract of land this afternoon, and it is not as good as I had expected to find. The too, the highway running through it ruins the block. However if you will go ahead and make the trade with them I will give the Company $7,000.00 and take the property subject to the $8,000.00 debt against it. That would be about in line with the 1000 shares I could buy if I had traded for the tract of land I mentioned to you some three weeks ago. I will not want to *182 purchase the 1000 shares on the other deal. If we go ahead on this deal, I will then purchase $20,000.00 of the bonds, when needed, in line with our conversation. By letter dated August 3, 1955 from Miller to petitioner the following was stated: The deed to this land should be made to the Western Republic Trust Company, which is acting as Trustee in this transaction, as the Insurance Company cannot buy or sell any property except on note foreclosures. The deed of conveyance, dated August 9, 1955, from trust company to petitioner covering the property was made expressly subject to a deed of trust lien reflected by a deed of trust executed by Winn and McMinn, to the Equitable Life Assurance Society, this deed of trust securing a note in the original sum of $9,000. Petitioners W. W. and Elsie L. Dees, on their income tax return for 1953, reported no income from insurance company, and for 1954 reported no income from insurance company except $50 director's fees. On their separate income tax returns for 1955, filed on a community property basis, neither reported any income from insurance company. Respondent, in his notice of deficiency to W. W. and Elsie L. Dees for the years *183 1953 and 1954, increased their reported income by the amounts of $56,500 and $127,600, respectively, designated as "compensation" with the following explanations: (a) It is determined that the fair market value of the 5,000 shares of the common capital stock of Western Republic Life Insurance Company of Austin, Texas, acquired by you December 21, 1953 at a cost of $7,500.00, or $1.50 per share, was $64,000.00, or at $12.80 per share, that the excess of the fair market value of the stock over the cost to you, or $56,500.00, constituted compensation to you for services rendered and to be rendered and that you realized this taxable income when you purchased the stock. * * * (a) It is determined that the fair market value of the 8,800 shares of the common capital stock of Western Republic Life Insurance Company of Austin, Texas, acquired by you April 21, 1954 at a cost of $13,200.00, or $1.50 per share, was $140,800.00, or $16.00 per share, that the excess of the fair market value of the stock over the cost to you, or $127,600.00, constituted compensation to you for services rendered and to be rendered and that you realized this taxable income when you purchased the stock. * * * *184 In each of the separate notices of deficiency for the year 1955, respondent increased the community income by an amount of $9,600 designated "additional income - Chairman of Board" and an amount of $1,510 designated "additional income" and by the amount of $8,865.62 designated "capital gain adjustment," and in each instance gave substantially the same explanations, as follows: (d). It is determined that the fair market value of the 600 shares of the common capital stock of Western Republic Life Insurance Company of Austin, Texas received by W. W. Dees in 1955 as compensation for services rendered and to be rendered as Chairman of the Board of Directors of Western Republic Life Insurance Company, was $9,600.00, or $16.00 per share, and as you did not report any income from this source in 1955 the amount of $9,600.00 has been added to the total community net income reported for the year 1955. (e). It is determined that in 1955 you and your husband realized taxable income of $1,510.00 through acquisition from the Western Republic Life Insurance Company of Austin, Texas, for $14,650.00, a farm acquired by such company in exchange for 1,010 shares of its capital stock having a fair *185 market value of $16,160.00. As W. W. Dees was Chairman of the Board of Directors of the life insurance company you realized taxable income at the date of acquisition of the farm. Therefore, $1,510.00 has been added to the community income reported by you and your husband. * * *
(1) It is determined that in the year 1955 you realized, as community income, long-term capital gains of $18,462.50 from the disposition by sale and exchange of 1,200 shares of the common capital stock of Western Republic Life Insurance Company of Austin, Texas, which gains were not included in the determination of income reported for the year 1955. Therefore, the community income reported is increased $9,231.25, computed as follows: 1,000 shares of stock
transferred to Hor-
ace E. White as
part payment for
217.65 acres of
land: Amount allowed
for stock
$16,812.50
Amount paid for
stock
1,500.00
Long-term gain realized
$15,312.50
200 shares of stock
sold to Frank Grif-
fin at $17.25 per
share: Amount received
for stock
$ 3,450.00
Amount paid for
stock
300.00
Long-term gain realized
3,150.00
Total long-term gain realized
$18,462.50
After adjustment *186 for a loss, 50 percent of the net gain as determined by respondent was $8,865.62 which he included as capital gain adjustment under additional income to the community in his notices of deficiency. For the year 1954 respondent increased the income as reported by petitioners William Angus and Mildred Wilma Wages by the amount of $28,250 designated "compensation" with the following explanation: (a) It is determined that the fair market value of the 2,500 shares of the common capital stock of Western Republic Life Insurance Company of Austin, Texas, acquired by you May 31, 1954 at a cost of $3,750.00, or $1.50 per share, was $32,000.00, or $12.80 per share; that the excess of the fair market value of the stock over the cost to you, or $28,250.00, constituted compensation to William Angus Wages for services rendered and to be rendered; and that you realized this taxable income when you purchased the stock. * * * Petitioner received as compensation from insurance company for services rendered and to be rendered the difference between the fair market value of the 5,000 shares of insurance company stock issued to him on December 21, 1953, and the 5,000 shares issued to him on April 21, 1954, and *187 the amount paid by him for such stock and received compensation in the amount of the fair market value of the 3,800 shares of insurance company stock issued to him on April 21, 1954, as compensation. The fair market value of insurance company stock on December 21, 1953, and April 21, 1954, was $5 and $5.50 per share, respectively. The Winn and McMinn farm acquired by trust company for 1,000 shares of insurance company stock and acquired by petitioner from trust company had a fair market value on the date of petitioner's acquisition thereof of $16,000. The White farm had a fair market value of $210 per acre on the date it was acquired by petitioner. Petitioner did not receive 600 shares of insurance company stock in lieu of salary in the year 1955 and did not sell 200 shares of insurance company stock to Frank Griffin in 1955. Opinion Issue 1 The first issue is whether petitioner's acquisition from Underwriters of 5,000 shares of insurance company stock on December 21, 1953, and his further acquisition from Underwriters of 8,800 shares of insurance company stock on April 21, 1954, constitutes income to petitioner in the amounts of the excess, if any, of the fair market value *188 of the stock on the dates of acquisition over the amounts paid therefor. Petitioner contends that he purchased 5,000 shares of insurance company stock on December 21, 1953, for $1.50 per share and 5,000 shares on April 21, 1954 for $1 per share, which was in each instance the fair market value of the stock on the dates of purchase, but that even if the fair market value of the stock was in excess of $1.50 and $1 per share on the respective dates, he realized no income from the transactions until he sold the stock. Petitioner takes the position that 3,800 of the shares of insurance company stock acquired by him on April 21, 1954, was compensation for services rendered but that the fair market value thereof on that date was not more than $1.50 per share. Petitioner does not contend that any dates other than those on which he acquired the stock should govern in determining whether he realized income from the transactions. Petitioner acquired the 10,000 shares of stock pursuant to an agreement with Miller and Wages, entered into prior to the incorporation of Underwriters and insurance company, that Wages and petitioner would be permitted to buy from Underwriters a reasonable amount *189 of insurance company stock at the average price paid for such stock by Underwriters. Petitioner contends that this was an arm's-length agreement fixing a bona fide price at which he would be entitled to purchase stock, that there was no correlation between the purchase of the stock and the services he rendered to insurance company, that the purchases were not intended to be a form of compensation, and that he was otherwise adequately compensated for the services he rendered. Respondent argues that the agreement allowing petitioner to buy the stock at the average price paid therefor by Underwriters was entered into in recognition of the services to be rendered by him to insurance company in contributing his name, prestige, and experience to the insurance enterprise, and that petitioner's acquisitions of stock pursuant to the agreement were in payment for the actual services he rendered in assisting in acquiring bank loans for Underwriters and in selling, or at least assisting in the selling, of insurance policies for insurance company. Miller was the moving force in setting up the insurance company but he needed help from others. Petitioner, because of his experience in the banking *190 business, his numerous contacts, and fine business reputation, could provide this help. Wages with his experience in the insurance business could provide help of a different type. The nature and extent of the discussions had between Miller, Wages, and petitioner before they embarked on this business venture are not clearly shown. Even the agreement allowing petitioner and Wages to buy insurance company stock from Underwriters at the price Underwriters paid for it is vague in that the amount of stock petitioner could buy was not specified. All that was stated was "a reasonable amount." Furthermore, the price to be paid was contingent on the price Underwriters paid insurance company for the stock. Notwithstanding this, it is clear that petitioner was given an option to buy at least a limited or reasonable amount of stock at a price to be ascertained later. The facts that the right, as such, to purchase the stock was granted by Miller, that the party to perform the contract, Underwriters, was not in existence at the time of the agreement, and that the stock being dealt in was of a third party, insurance company, do not change the essential character of the agreement and the purchases *191 pursuant thereto. It was evident when the stock purchase agreement was made, that the price to be paid by petitioner for the stock would be a price well below the price at which the stock would be offered to the public and would in all probability, depending on when petitioner elected to exercise his right, be below the fair market value of the stock. It is clear that the parties considered the agreement to provide for a bargain purchase by petitioner. It is also clear that it was contemplated that petitioner would lend assistance to insurance company to be entitled to exercise the right. The record does not show to what extent the relationship between Underwriters and insurance company was agreed upon at the time the stock purchase agreement was made, but it is clear that it was contemplated that the money needed to commence the business of insurance company was to come primarily from the public offering of insurance company stock. In fact, the public offering price of insurance company stock was set by considering the amount needed to capitalize insurance company. Transactions between Underwriters and insurance company were not arm's-length. Underwriters was merely a conduit *192 for funding insurance company. The price Underwriters was to pay for insurance company's stock was governed by the amount of funds Underwriters would have available, and the price Underwriters paid for insurance company stock in order to give insurance company its initial capital was unrelated to any market value of the purchased stock. Absent other factors, the natural result of sales of insurance company stock to the public and the receipt by insurance company of $12.80 for each share so sold would be an increase in value of the stock. As such public sales were made, the book value of each share outstanding would rise above the $1.25 average paid by Underwriters for the 199,950 share block of insurance company stock it owned. There was apparently no time limit on petitioner's option to purchase insurance company stock at the $1.25 average figure. It may be noted that petitioner did not exercise his option until there had been some sales at the public offering price of $16 with a resulting increase in the net worth of insurance company. Also, at the time of petitioner's first purchase, the indications were that the public offering of insurance company stock would be successful. *193 The purchases were not arm's-length transactions, and the option rights given petitioner were intended by the parties to result in a bargain purchase for petitioner. The purchase agreement and the purchases made pursuant thereto were either a means of inducing petitioner to embark on the venture of compensating him for services rendered. In either circumstance, the bargain purchases are to be treated as compensation. Cf. Commissioner v. LoBue, 351 U.S. 243 (1956), and Commissioner v. Smith, 324 U.S. 177 (1945). Petitioner suggests that respondent has on brief shifted his position as to the identity of the party for which petitioner performed services and by which petitioner was supposedly compensated via the bargain purchase. We do not agree with petitioner in this respect. In the notice of deficiency respondent designated the difference between the price petitioner paid for the stock and the fair market value thereof as "compensation to you for services rendered or to be rendered." There was no designation as to the entity receiving petitioner's services. In view of the community of interest between Underwriters and insurance company, which entity was *194 the recipient of the services for which petitioner was being compensated becomes unimportant. The notice of deficiency adequately notified petitioner that the amounts were being treated as compensation. Petitioner relies upon Trust Co. of Georgia v. Rose, 25 F. 2d 997 (N.D. Ga., 1928), affd. 28 F. 2d 767 (C.A. 5, 1928) as supporting his position that income is not received upon a bargain purchase of stock. In that case a new corporation was set up to acquire the stock and assets of an old corporation. The taxpayer therein was a moving force arranging the acquisition of the stock of the old corporation and the creation of the new corporation. The taxpayer in August 1919 with others entered into a syndicate agreement whereby the parties thereto agreed to purchase 83,000 shares of common stock of the new corporation at $5 per share and to underwrite the remaining 417,000 shares for sale to the public at $35 per share. The taxpayer received 13,677 shares of common stock at $5 per share. The difference between the $5 per share the taxpayer paid for the 13,677 shares and the public selling price for the stock was determined by the Commissioner to be income to *195 the taxpayer upon the purchase of the stock. The court held that any gain arising out of the acquisition of the stock would not be taxable until the taxpayer sold the stock. In the Trust Co. of Georgia case, the court held that the transaction there involved was a purchase in good faith, that on the date the taxpayer contracted to buy the stock it had no market value and its future was wholly uncertain. The Trust Co. of Georgia case did not involve an employer-employee type relationship, the taxpayer was not being induced to perform or compensated for performing services for another but was, as a syndicate member and as a prime mover, acting on its own behalf. The Trust Co. of Georgia case is distinguishable on a factual basis from the instant case. Issue 2 The second issue concerns the fair market value of insurance company stock on December 21, 1953, and April 21, 1954. [2]
*196 Respondent has determined that insurance company stock was worth $12.80 per share and $16 per share on the respective valuation dates. Petitioner contends that the stock was not worth more than the $1.50 and $1 per share amounts he paid for the stock on the dates of purchase. In support of his position, respondent points to the sales made to the public under the stock promotional set up, the fact that the purchasers were making a long-term investment and had faith in the eventual success of the company, and the fact that petitioner and Miller considered the stock a good buy at $16. Petitioner, on the other hand, argues that the public sales of the stock were the result of highly aggressive sales tactics, that for the most part the purchasers were woefully uninformed about the affairs of insurance company, and that, in effect, this ignorance and gullibility on the part of the stock purchasers explains why the stock was sold at the higher price. Valuation is a question of fact and is necessarily an approximation. Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957), affirming in part a Memorandum Opinion of this Court. It must be arrived at on the basis of all facts *197 of record which reasonably bear on determining the price which a willing purchaser would pay to an equally willing seller, without compulsion on either side and with both having knowledge of the facts. O'Malley v. Ames, 197 F. 2d 256 (C.A. 8, 1952). Cf. Estate of Samuel Want, 29 T.C. 1223, 1246 (1958), modified on other issues 280 F. 2d 777 (C.A. 2, 1960), for distinction between necessary considerations in determining fair market value of stocks not listed on any exchange and those stocks listed on an exchange for which there is "a universally accepted market price, the result of numerous transactions in which the general public freely participated." The sales to the public which respondent heavily relies upon in support of his determination were the result of extensive high pressure sales activities on the part of Underwriters from November 1953 until November 1955. Underwriters had 25 full-time salesmen and about 10 part-time salesmen selling insurance company stock. The salesmen covered the whole State of Texas. As of December 31, 1953, Underwriters had sold to the public at least 1,099 shares at $16 per share outright and an additional *198 3,625 shares had been sold on 3-year subscription contracts at $20 per share. By April 21, 1954, an additional 7,041 shares had been sold outright at $16 per share and at least 5,425 additional shares had been subscribed to under the 3-year subscription contracts. In all, approximately 50,000 shares of insurance company stock had been sold by August 19, 1955. The sales were generally in small quantities of 25, 50, or 100 share lots. The sales effort and promotion used was that of personal solicitation. One purchaser was called upon 15 different times by the same salesman. Most of the purchasers bought their stock without becoming acquainted with the available information as to the financial condition of insurance company. There is no evidence of fraudulent practices, but it is apparent that the salesmen were taking advantage of a situation which one witness described as "insurance fever" in the State of Texas. The salesmen were provided with a "pitch kit" which inter alia contained a statement of the amount earned on a hypothetical investment in one insurance company set up in Texas which had experienced a tremendous growth. Apparently, no mention was made of numerous other insurance *199 companies that had suffered financial reverses. A number of other insurance companies were being organized in Texas at the same time apparently under the same type of promotional plan. At the time petitioner acquired his first 5,000 shares of stock over 95 percent of the outstanding insurance company stock was held by Underwriters who had paid an average price of $1.25 per share. At that time insurance company was still in a formative stage. It had no earnings record, the book value of its outstanding stock was approximately $3 per share. The situation was only slightly changed when petitioner acquired his second 5,000 shares. Petitioner had agreed with Miller not to sell his insurance company stock during the promotion period. Although no binding agreement is shown by the evidence, we think the evidence shows that petitioner had at least a moral obligation not to sell his stock. The reason for the prohibition, as stated by Miller, was that if the founding fathers did sell their own stock this would undermine the public offering and the stock salesmen would leave the organization. Respondent points to the sales of insurance company stock in 1953 by Banks and Zella Miller as disproving *200 the existence of any agreement not to sell. However, the sales by Banks and Zella Miller were primarily for the purpose of enabling Miller to buy some insurance company revenue bonds which otherwise could not be disposed of. Such sales were so related to the well being of the insurance organization that they apparently constituted a permissible exception. In order to protect the promotion price of insurance company stock, trust company was formed and it purchased over 2,000 shares of insurance company stock on the market at the promoted price from stock purchasers who wanted to sell. There had been instances of dissident holders of insurance company stock threatening to put advertisements in the paper offering the stock for sale below the promoted price. Upon consideration of all the evidence of the circumstances surrounding the public sales of insurance company stock, we do not believe that such sales are indicative of the fair market value of that stock. See Estate of John W. Rapp, 24 B.T.A. 1061, 1069-1070 (1931); C. A. Bryan, et al., 19 B.T.A. 111, 123-126 (1930); Daniel Kelly, et al., 10 B.T.A. 141 (1928); Wallis Tractor Co. et al., 3 B.T.A. 981, 1000-1003 (1925); *201 and Fruen Investment Co., 2 B.T.A. 542 (1925). On the other hand, we feel the stock was worth more than the average price paid therefor by petitioner. The book value of the stock was approximately $3 per share on December 31, 1953. At the time petitioner acquired his stock the public promotion was underway and the indications were that it would be successful. As each share was sold to the public, the paid-in surplus of insurance company was increased by $12.80, the implication being that with each succeeding public sale petitioner's share in the paid-in surplus of insurance company would increase. The record also shows that persons with some knowledge of the affairs of insurance company, such as agents, other employees of both Underwriters and insurance company and members of the board of directors of insurance company purchased the stock for $12.80. Miller testified that petitioner at the time he received the stock could have sold it for $5 per share. Based on all the evidence we hold that the 5,000 shares of insurance company stock acquired by petitioner on December 21, 1953, and the 8,800 shares acquired on April 21, 1954, had a fair market value of $5 and $5.50 *202 per share on the respective dates. Issue 3 The next issue is whether petitioner received income upon the purchase from trust company of farm property originally belonging to Winn and McMinn. Petitioner purchased the farm in 1955 for $7,000 cash and took it subject to a note of $7,650. The deed of sale went from trust company to petitioner. Prior to the sale of the land by trust company to petitioner, trust company had acquired the land from Winn and McMinn paying therefor 1,000 shares of insurance company stock. On the purchase of the land by trust company, the stated value placed on the 1,000 shares of insurance company stock was $25 per share. In the notice of deficiency respondent determined that petitioner realized "income of $1,510 through acquisition from the Western Republic Insurance Company of Austin, Texas, for $14,650, a farm acquired by such company in exchange for 1,010 shares of its capital stock having a fair market value of $16,160. As W. W. Dees was Chairman of the Board of Directors of the Life insurance company you realized taxable income at the date of acquisition of the farm." On brief respondent concedes that only 1,000 shares of insurance company stock *203 instead of 1,010 shares were paid for the farmland subsequently sold to petitioner, that the fair market value of the land was $16,000, and that petitioner realized income of only $1,350 on his bargain purchase rather than $1,510 as determined in his notice of deficiency. Petitioner contends that his purchase of the farmland from trust company for $7,000 cash, subject to a $7,650 note, was a bona fide arm's-length transaction for a full and adequate consideration. Petitioner further contends that respondent has the burden of proof on this issue, that respondent has not alleged the value of the land petitioner received, that contrary to respondent's determination the evidence shows he acquired the land from trust company and not from insurance company, and that he never was an employee of trust company. Respondent's position is that petitioner received the benefits of a bargain purchase which constituted a form of additional compensation for services rendered. Respondent in his notice of deficiency determined the value of the land and that petitioner received taxable income of the difference between the value of the property and the amount paid therefor. The burden of proof is on *204 petitioner to show the sale to be bona fide. The burden of proof does not shift merely because respondent has made a downward adjustment in the amount of the deficiency as he did here or because he was somewhat inaccurate in his statement that petitioner acquired the property from insurance company when, in fact, he technically acquired it from trust company. Cf. Standard Oil Co., 43 B.T.A. 973, 998-999 (1941) affd. 129 F. 2d 363 (C.A. 7, 1942), certiorari denied 317 U.S. 688. Petitioner was fully apprised of respondent's position. Whatever discrepancies may exist between the facts stated in the notice of deficiency and those shown of record are not material. Respondent has determined, in effect, that the farm property received by petitioner was worth $1,350 in excess of the amount petitioner paid for it. Respondent apparently valued the land by relating such value to the value he ascribes to the 1,000 shares of stock used by trust company to purchase the land. [3] If petitioner wants to show that the land was not worth the amount respondent contends and, in fact, was not worth more than the amount he paid, it is his burden to adduce such evidence. *205 Petitioner has not offered any such evidence. Winn testified that he and McMinn acquired 327 acres which petitioner ultimately acquired, part in 1952 and part in 1954, at a cost of $60 per acre. This is a total purchase price of $19,620. The amount of land purchased by petitioner from trust company was 435.16 acres which apparently *206 represented the same land. There is no explanation in the record for the discrepancy between 327 acres and 435.16 acres or whether additional land was included in the second sale. A presumably arm's-length purchase made within 1 and 3 years of the valuation date where there is no indication of intervening factors is a reliable factor in valuing property. Based on this testimony, we have found the land purchased by petitioner to be worth not less than $16,000 at the date it was acquired by petitioner. Petitioner has offered no evidence showing the sale to be a bona fide arm's-length transaction notwithstanding the discrepancy in the value of the property received over the amount paid therefor by petitioner. There is some suggestion in a letter from petitioner to Miller that as part of the deal whereby he would buy the land, paying $7,000 cash and taking subject to the mortgage, petitioner would also buy $20,000 worth of bonds "when needed." However, it is not shown whether or to what extent such a purchase by petitioner would be detrimental to him or would in any way constitute additional consideration on his part for the land. Once it is decided that the transaction was not arm's-length *207 but rather a bargain purchase to petitioner, the question whether the sale was made by trust company acting on its own or as trustee or agent for insurance company is relatively unimportant. In the notice of deficiency petitioner's services as chairman of the board of directors of insurance company are the offered explanation for the extra compensation. There is an indication in the record that trust company was acting as an intermediary for insurance company because of the latter's inability to take title to property except in certain circumstances not present in connection with the purchase from Winn and McMinn. In view of the fact that all three of the enterprises, Underwriters, insurance company, and trust company, are interrelated and have a community of interest, it would not be surprising, assuming trust company was not acting as insurance company's agent, that the bargain purchase or compensation might run from trust company to petitioner. There is no evidence of record, nor does petitioner contend, that the transaction constituted a gift. Cf. Commissioner v. Duberstein, 363 U.S. 278 (1960). We hold that petitioner received income of $1,350 from this bargain purchase *208 of land. Cf. Commissioner v. LoBue, supra.
Issue 4 Respondent determined that petitioner realized income of $9,600 from the receipt of 600 shares of insurance company stock paid as compensation in 1955. In making his determination respondent valued the stock received at $16 per share. Petitioner concedes that the 600 shares were paid as compensation, that the payment was made in lieu of a $250 monthly salary he had been authorized to receive as chairman of the board of directors of insurance company for 1955 and 1956, but petitioner contends he did not receive the stock either actually or constructively until 1956. In support of his determination respondent points to the fact that the stock certificate covering the 600 shares in issue, was dated August 19, 1955, and that it was the company's practice to date share certificates on the date issued. Respondent contends that, in any event, the stock certificate was subject to petitioner's demand in 1955 and was, therefore, constructively received by him in that year. The discrepancy between the August 19, 1955, issuance date on the certificate and petitioner's receipt thereof was explained by Miller who testified *209 that he had the particular stock certificate set aside in 1955 in anticipation of asking petitioner to accept the stock in lieu of his cash salary, that both petitioner and the other members of the board of directors of insurance company had to concur in this arrangement, that the requisite consent was not given until 1956, and that the certificate of stock was actually issued on May 9, 1956, and delivered to petitioner in 1956. We based our finding of fact that petitioner received the stock in 1956 on this testimony. There was no testimony to the contrary. The evidence is clear that petitioner could not at his free demand obtain the stock certificate prior to 1956. We, therefore, hold that petitioner did not realize income in 1955 by the receipt of 600 shares of insurance company stock in lieu of salary for 1955 and 1956 as chairman of the board of directors of insurance company. Issues 5 and 6 The next issue is whether petitioner realized a gain of $19,962.50 on the disposition of 1,200 shares of insurance company stock in 1955. Respondent originally determined that petitioner realized a gain of $15,312 upon the transfer of 1,000 shares of insurance company stock to White as *210 part payment for the purchase of 217.65 acres of land. In computing the gain respondent had allowed petitioner a cost basis of $1,500 for the stock transferred. By amendment to his answer respondent made claim for an increased deficiency based upon disallowing the $1,500 basis for the stock. The parties have now stipulated that petitioner had a zero basis for the 1,000 shares transferred to White in part payment for certain land. Respondent also determined that petitioner sold 200 shares of insurance company stock to Frank Griffin at $17.25 per share for a total gain of $3,150.50. The issue with respect to the purchase of the land from White is entirely a matter of valuation of the land received by petitioner. On August 22, 1955, petitioner purchased the land paying $22,250 cash, 1,000 shares of insurance company stock, and taking it subject to a note in the amount of $15,250. Prior to selling the land to petitioner, White had tried unsuccessfully to sell it to others at $250 per acre. The stated purchase price for the land was $54,312.50 and the stated value of the stock paid in exchange was something over $16 per share. However, petitioner in negotiating with White did not consider *211 the land worth $250 per acre but rather considered it worth $175 per acre, nor did White consider the stock worth $16 per share. Three witnesses, Sikes, Blake, and petitioner, testified with respect to the value of the land. Sikes and Blake were both realtors who had dealt in some manner with the land. Sikes had loaned money to a contractor who, approximately 1 1/2 years after petitioner's purchase, made physical improvements on the land. Sikes testified that the land was worth between $150 and $180 per acre. Blake was a realtor who had, prior to the sale of the land to petitioner and while acting on behalf of White, tried unsuccessfully to sell the land to others at a price of $250 per acre. Blake testified that the land was worth $175 per acre. Petitioner also testified that the land was worth $175 per acre. Respondent did not offer any expert testimony with respect to the value of the land. In support of his determination, respondent relies on the fact that the stated purchase price of the land was $54,312.50, or $250 per acre, that $42.90 of documentary stamps, indicating an equity transferred by White of approximately $39,000 ($54,312.50 value less $15,250 note) were attached *212 to the deed, that in 1959 petitioner sold 20 acres of the land at $900 per acre, and that under petitioner's valuation of the land the value received for the stock petitioner paid White would be less than 52 cents per share. Respondent contends that 52 cents consideration for a share of insurance company stock is unrealistically low. Respondent also questions the reliability of the testimony of petitioner's expert witnesses respecting the land value referring to it as "conveniently consistent." In making our determination of the land value we are free to consider all the relevant factors. Helvering v. Safe Deposit & Trust Co. of Baltimore, 95 F. 2d 806 (C.A. 4, 1938), affirming 35 B.T.A. 259 (1937); Mistrot v. Commissioner, 84 F. 2d 545 (C.A. 5, 1936), affirming a Memorandum Opinion of this Court. The evidence with respect to the land value is not altogether satisfactory. Much of it concerns the poor condition of the land and its propensity to overflow, and though descriptive is not particularly helpful in determining a dollar valuation. The value of land in this part of Texas appears to vary widely from farm to farm. The two factors we think *213 to be most indicative are the expert testimony of Sikes and Blake and the amount of consideration petitioner, in an arm's-length transaction, paid White for the land. Balancing these two factors and considering all the other evidence of record, we have found the land received by petitioner to have been worth $210 per acre on the date petitioner bought it. The expert testimony offered by petitioner's witnesses, which would indicate a lower valuation was not offset by any expert testimony offered by respondent. However, no persuasive facts were shown by these witnesses to support their conclusion as to value. In determining the value of assets received, we feel we should take into consideration the value of what was paid, especially when the transaction is, as here, at arm's length. Cf. Guggenheim v. Rasquin, 312 U.S. 254 (1941), and United States v. General Shoe Corporation, 282 F. 2d 9, 13 (C.A. 6, 1960). Petitioner paid 1,000 shares of insurance company stock for the land as well as $22,500 cash, and took title subject to a $15,250 note. Without making an exact determination of the value of insurance company stock and realizing that on this transaction *214 petitioner might have made himself a bad deal, we feel the stock was worth considerably in excess of the 52 cents per share which would be the amount received per share were petitioner's valuation of the land adopted, and that this higher valuation attributable to the stock is a factor in determining the value of the land received in exchange therefor. Respondent's arguments that the stated purchase price on the contract of sale, the documentary stamps on the deed, and the fact that petitioner sold 20 acres of the White farm in 1959 at $900 per acre, indicate a $250 per acre valuation, are all adequately answered by Blake's testimony that prior to petitioner's purchase he tried to sell the land at $250 per acre and was unsuccessful. Also the fact that the parties stated the stock paid for the land to be worth $16 per share does not preclude a finding that the stock paid was worth less. Cf. W. A. Bahr, 10 B.T.A. 637 (1928). For the same reason the fact that the purchase price of the land was stated at $54,312.50 in the contract does not preclude a finding of a lower value for the land. The only evidence in the record as to the purported sale of 200 shares of insurance *215 company stock by petitioner to Frank Griffin in 1955 is petitioner's statement that he sold no stock to Griffin in that year and we have found accordingly. Respondent does not discuss this point on brief and has apparently conceded the issue. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: W. W. Dees, Docket No. 81909; W. W. Dees and Elsie L. Dees, Docket No. 81910; and William Angus Wages and Mildred Wilma Wages, Docket No. 82404.↩
2. It has been stipulated that the April 21, 1954, valuation will apply to the purchase by Wages of 2,500 shares of insurance company stock for $3,750 on May 31, 1954. Wages concedes that to the extent that the fair market value of the stock exceeded $1.50 per share, he received compensation for services.↩
3. Respondent appears not to have followed through consistently on his method of determining the deficiency. In the deed of conveyance from trust company to petitioner it is recited that the conveyance is subject to a deed of trust in the original amount of $9,000 taken out by Winn and McMinn. From this it is apparent that trust company purchased only Winn and McMinn's equity in the land for the 1,000 shares it paid and took subject to the indebtedness. Petitioner, in turn, purchased the same interest in the land trust company acquired, paying $7,000 cash and also taking subject to the indebtedness. This being so, no reason appears why respondent, under his theory, did not value the interest in the land acquired by petitioner at $16,000, and determine taxable income to petitioner of $9,000 ($16,000 value less $7,000 cash paid) instead of $1,350.↩