JOSEPH R. CALLY AND FLORENCE E. CALLY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cally v. Commissioner
Docket No. 11609-80.
United States Tax Court
T.C. Memo 1983-203; 1983 Tax Ct. Memo LEXIS 585; 45 T.C.M. (CCH) 1312; T.C.M. (RIA) 83203; April 12, 1983. James J. Cally, for the petitioners. Gerald A. Thorpe, for the respondent. HAMBLEN
MEMORANDUM *587 FINDINGS OF FACT AND OPINION HAMBLEN, Judge:* Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1976
$37,308.00
1977
17,254.00
1978
15,489.00
By amended answer, respondent redetermined the deficiency in tax for 1978 as $18,326, increasing the deficiency by $2,837. After concessions, the issues for decision are: 1. Whether respondent properly determined under section 482[1] and the regulations thereunder that petitioners and a related partnership paid rents in excess of an arm's length rental charge for certain properties leased from two related corporations. 2. Whether petitioners realized a long-term capital gain or long-term capital loss upon the liquidation of Catamount Realty, Inc.
3. Whether petitioners are entitled to claimed home office expense deductions under section 280A. 4. Whether petitioners are entitled to a claimed business expense deduction attributable to a trip to South America to attend *588 a medical seminar. 5. Whether petitioners are entitled to claimed automobile expense deductions in excess of the amounts allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Joseph R. Cally (hereinafter petitioner) and Florence E. Cally, husband and wife, resided in Catskill, New York, when they filed their 1976, 1977, and 1978 joint Federal income tax returns with the Internal Revenue Service Center, Andover, Massachusetts, and when they filed their petition in this case. For the sake of clarity, we have divided the findings of fact into two parts--those relating to petitioner's medical practice and those relating to his real estate investments. Petitioner's Medical Practice
At all times relevant hereto, petitioner was a medical doctor specializing in general surgery, while also maintaining a general practice. Petitioner performs most surgery requiring hospitalization in the Catskill Memorial Hospital which is approximately two miles from his residence. *589 He renders medical services not requiring hospital care at various other locations. In addition to his private practice, petitioner acted as the Greene County Medical Examiner and as the attending physician at both the Greene County Jail and the Coxsackie Correctional Institution from 1976 through 1978. During the years in issue, petitioner maintained a fully equipped office in Catskill, New York, near the Catskill Memorial Hospital. Petitioner also maintained a home office consisting of a waiting room, examination room, consultation room, bathroom, and physician's office. The home office comprises about 20 percent of the floor space of his residence and has a separate entrance for patients. From January 28, 1977, through February 11, 1977, petitioner, his wife, and their son traveled to South America where petitioner attended a medical seminar sponsored by the medical societies of Erie and Monroe Counties, Missouri. During the 14-day trip, they visited three South American cities: Lima, Peru; Rio de Janeiro, Brazil; and Caracas, Venezuela. The following activities were scheduled during the course of the seminar: Date
Time
Location
Activity
Jan. 29, 1977
5:30 - 6:30 p.m.
Lima
Lecture - Witchcraft in Peru
Feb. 1, 1977
5:30 - 6:30 p.m.
Lima
Lecture - Health Sciences in
Ancient Peru
Feb. 3, 1977
5:30 - 6:30 p.m.
Rio de Janeiro
Lecture - Medicine
in Brazil -
Practice and Problems
Feb. 6, 1977
8:00 - 9:00 a.m.
Rio de Janeiro
Lecture - Psychology
in Brazil Today
Feb. 7, 1977
5:30 - 6:30 p.m.
Caracas
Lecture - Scope of Clinical
Immunology
Feb. 9, 1977
8:00 - 9:00 p.m.
Caracas
Film - The Treatment of
Acute Drug Overdose
Feb. 10, 1977
9:00 - 11:00 a.m.
Caracas
Hospital Visit - Visit to
Hospital Perez-Care
*590 In addition, the seminar had scheduled a two hour special exchange panel consisting of physicians speaking on topics of their choice in Rio de Janeiro on February 4, 1977. Only ten hours of business activities were scheduled during the 14-day trip. For attending the seminar, petitioner received ten hours of credit towards the Physicians' Recognition Award of the American Medical Association. The cost of the South American trip was as follows: Cost attributable to Dr. Cally
$1,238.00
Cost attributable to Mrs. Cally and their son
2,476.00
Cost attributable to side trips taken during
tour
945.00
Total
$4,659.00
Petitioner paid in advance during 1976 for the trip to South America. On his 1976, 1977, and 1978 tax returns, petitioner claimed the following office and automobile expense deductions: Home Office
Automobile
Year
Expense
Expense
1976
$1,797
$3,133
1977
729
2,675
1978
825
2,673
Petitioner also claimed a deduction of $4,659 for the cost of the trip to South America under the heading of professional dues and continuing education costs on his 1976 return. In the notice of deficiency, respondent disallowed petitioner's *591 claimed home office expense deductions because he failed to establish that the office was exclusively used on a regular basis to meet with patients as required under section 280A. [2] Respondent also determined that petitioner was only entitled to an automobile expense deduction of $500 for each of the years in issue because the amounts claimed in excess thereof represented personal commuting expenses. In addition, respondent disallowed the deduction that petitioner claimed for the trip to South America on the ground that petitioner failed to satisfy the requirements set forth under section 274. Petitioner's Real Estate Investments
On June 11, 1973, Leonard DiStefano (hereinafter DiStefano) and Douglas R. Hansen organized a New York corporation known as the DiStefano and Hansen Development Co., Inc. (hereinafter *592 DH), to purchase a parcel of land and to borrow funds to construct thereon an apartment complex referred to as the Grandview Garden Apartments. DH's certificate of incorporation stated that when the construction of the Grandview Garden Apartments was completed title thereto would be conveyed to a general partnership between DiStefano and Douglas R. Hansen and that the corporation was merely acting as the nominee for such partnership. On January 9, 1974, DiStefano organized a New York corporation known as Highland Avenue Estates, Inc. (hereinafter HAE), to purchase two apartment complexes known as the Hilltop Apartments and the Villa Verde Apartments. At all times relevant herein, HAE had legal title to the Hilltop and Villa Verde Apartments, while DH had legal title to the Grandview Garden Apartments. On July 1, 1974, petitioner and DiStefano formed a partnership (hereinafter referred to as "the Grandview Garden partnership"), agreeing to share equally in the profits and losses therefrom, for the purpose of operating the property to which DH held legal title, that is, the Grandview Garden Apartments. Similarly, at some time prior to 1976, petitioner acquired a one-half interest *593 in a partnership known as Highland Avenue Estates (hereinafter "the HAE partnership") which had been formed to operate the Hilltop and Villa Verde Apartments. At or about the same time that petitioner acquired his interest in the aforementioned partnerships, he acquired 50 percent of the stock in both corporations. Prior to 1976, petitioner and DiStefano disregarded the corporate entity of both HAE and DH for tax purposes, and all of the income and expenses attributable to the ownership and operation of the apartment complexes were reported on partnership returns filed by petitioner and DiStefano for the HAE and Grandview Garden partnerships. On or about January 1, 1976, petitioner and DiStefano decided, upon the recommendation of petitioner's accountant, Alexander Varga, to recognize the corporations' ownership of the apartment complexes for tax purposes and to lease the apartment complexes to the partnerships. Upon being retained by petitioner, Mr. Varga had concluded that petitioner and DiStefano could recognize the corporations' legal title to the apartment complexes and obtain the same economic consequences that they achieved by treating the partnerships as the owners by leasing *594 the apartment complexes to the partnerships. Consequently, on or about January 1, 1976, the board of directors of HAE decided to lease the Hilltop and Villa Verde Apartments to the HAE partnership on a yearly basis for an initial annual rent of $36,000. Similarly, on or about January 1, 1976, the board of directors of DH decided to lease the Grandview Garden Apartments to the Grandview Garden partnership on a yearly basis for an initial annual rent of $92,000. The board of directors of each corporation also resolved that each such corporation would be liable for the following items attributable to their respective properties: (1) Real property taxes; (2) insurance expenses; (3) water and sewer charges; and (4) all indebtedness attributable to mortgages and other bank loans.The corporations never entered into written leases with the partnerships. From January 1, 1976, through May 31, 1976, the HAE partnership paid $15,000 in rent to HAE for the Hilltop and Villa Verde Apartments and received $16,814.18 in rent from subleasing such apartments. From January 1976 through May 31, 1976, the Grandview Garden partnership paid $38,000 in rent to DH for the Grandview Garden Apartments *595 and received $23,302 in rent from subleasing such apartments. Sometime prior to June 1, 1976, petitioner and DiStefano agreed to terminate their business relationship effective June 1, 1976. Consequently, on June 1, 1976, the HAE and Grandview Garden partnerships were dissolved, and HAE and DH redeemed DiStefano's stock therein in exchange for the Hilltop Apartments and $10,000 in cash. Thereafter, petitioner, in his individual capacity, continued to lease the Villa Verde and Grandview Garden Apartments from the corporations. Petitioner also continued subleasing the apartments. While the lease of the Villa Verde and Grandview Garden Apartments to petitioner is reflected in the corporate minutes of DH and HAE, no written lease was ever executed. During the periods specified below, petitioner agreed to make the following rental payments to lease the Villa Verde and Grandview Garden Apartments and collected the following rents from subleasing such apartments: Villa Verde
Grandview Garden
June 1 - Dec. 31, 1976
Apartments
Apartments
Rental payments
$14,000
$54,000
Rent collected
7,373
29,185
1977
Rental payments
$11,000
$75,000
Rent collected
11,354
57,211
1978
Rental payments
$11,000
$77,000
Rent collected
10,252
65,798
*596 Sometime prior to January 1, 1976, petitioner acquired 50 percent of the stock of Catamount Realty, Inc. (hereinafter Catamount Realty), a New York corporation, which owned a farm. The other 50 percent of the corporation's stock was owned by DiStefano. Petitioner and DiStefano formed a partnership known as Catamount Realty (hereinafter the Catamount partnership), and all of the income and expenses relating to the property owned by the corporation was reported on partnership returns filed by petitioner and DiStefano. [3]
On January 23, 1976, the property owned by Catamount Realty was sold to an unrelated third party for a total purchase price of $175,000. On February 10, 1976, Catamount Realty was liquidated. [4] Upon the liquidation of Catamount Realty, petitioner and DiStefano each received a distribution of $5,135 in cash. At the time of the liquidation, petitioner's basis in his Catamount Realty stock was $20,245. *597 On his 1976 tax return, petitioner claimed deductions of $3,090 and $14,758, respectively, for his distributive share of the HAE and Grandview Garden partnership losses. Petitioner also reported the following gross rents and expenses from his lease and sublease of the Villa Verde and Grandview Garden Apartments on his 1976, 1977, and 1978 returns: 1976
1977
1978
Gross rents
$36,558
$68,565
$76,050
Rental expenses (includes
rent paid to corporations)
78,265
100,295
103,755
Net loss
$41,707
$31,370
$27,705
In addition, petitioner reported a gain of $14,524 as his distributive share of the long-term capital gain reported by the Catamount partnership from the sale of the property owned by Catamount Realty. [5]
*598 In the notice of deficiency, respondent, relying on section 482, determined that in order to clearly reflect income and prevent the evasion of taxes (1) the deductions claimed by petitioner for his distributive share of the HAE and Granview Garden partnership losses must be disallowed and (2) the losses claimed by petitioner with respect to his lease and sublease of the Villa Verde and Grandview Garden Apartments must be disallowed. In both instances respondent determined that all of the income and expenses with respect to the operation of the apartment complexes was allocable to the corporations. Subsequently, respondent determined that only the amounts by which the rents paid to the corporations exceeded an arm's length rental charge for the properties (i.e., the fair rental value of the properties) should be disallowed as deductions pursuant to section 482. In an amended answer, respondent determined an increase in the deficiency for 1978 of $2,837. [6]
*599 Pursuant to section 1.482-2(c), Income Tax Regs., respondent has computed the fair rental value of the properties and the excess rent deducted by the partnerships and petitioner as follows: Property leased to HAE and Grandview Garden partnerships (1/1/76 - 5/31/76): Fair Rental Value
Villa Verde and Hilltop
Grandview Garden
Apartments (HAE)
Apartments
Depreciation
$ 5,232
$ 6,650
Three percent of depreciable
basis
3,924
6,229
Direct and indirect expenses: Insurance
1,743
1,426
Real property taxes
3,776
7,953
Water and sewer charges
2,201
Fair rental value
$16,876
$22,258
Excess Rent
Rent deducted
$15,000
$38,000
Less fair rental value
16,876
22,258
Excess
None
$15,742
Property leased to petitioner: Fair Rental Value
Villa Verde Apartments
Grandview Garden Apartments
6/1/76 -
6/1/76 -
12/31/76
1977
1978
12/31/76
1977
1978
Depreciation
$ 1,670
$ 2,848
$ 2,848
$ 9,425
$16,075
$16,075
Three percent of
depreciable basis
1,252
2,136
2,136
8,827
15,056
15,056
Direct and indirect
expenses: Insurance
221
79
729
2,022
2,000
2,238
Real property taxes
699
1,746
1,805
11,274
17,788
14,711
Water and sewer
charges
553
280
260
1,060
1,784
Other
435
Fair rental value
$ 4,395
$ 7,089
$ 7,778
$31,548
$51,979
[7] $50,299
Excess Rent
Rent deducted per
returns
$14,000
$11,000
$11,000
$54,000
$75,000
$77,000
Less fair rental
value
4,395
7,089
7,778
31,548
51,979
50,299
Excess rent
$ 9,605
$ 3,911
$ 3,222
$22,452
$23,021
$26,701
*600 In the notice of deficiency, respondent also determined that petitioner realized a long-term capital gain of $20,465 upon the liquidation of Catamount Realty, computed as follows: Amount realized in cash closing
$42,306
Less: Liabilities outstanding
1,375
Net amount realized
$40,931
Basis is stock (now verified)
0
Gain on liquidation
$40,931
Your share of gain 50 percent
$20,465
Finally, respondent determined that petitioner improperly reported a long-term capital gain of $14,524 upon the sale of the property owned by Catamount Realty and, accordingly, decreased petitioner's long-term capital gain for 1976 by the same amount. In the petition filed herein, petitioner has claimed that he had a basis of $20,245 in his Catamount Realty stock, that he received only $5,135 from the liquidation and, therefore, that he realized a long-term capital *601 loss of $15,110 upon the liquidation. OPINION Issue 1: Section 482 Arm's Length Rental Charge
We must decide whether respondent properly determined that the corporations charged petitioner and the Grandview Garden partnership rents in excess of an arm's length rental charge. It is first necessary for us to consider whether the burden of proof has shifted to respondent on this issue. In the notice of deficiency, respondent determined, pursuant to his authority under section 482, that the losses claimed by petitioner and the partnerships with respect to the property leased from the corporations must be disallowed in order to clearly reflect income and prevent the evasion of taxes. He completely disallowed such losses and allocated to the corporations all of the income and expenses attributable to the operation of the apartment complexes.Subsequently, respondent decided to recompute the section 482 adjustment on the basis of an arm's length rental charge for such properties, disallowing the claimed losses and allocating them to the corporations only to the extent that the rents charged to the partnership and petitioner exceeded an arm's length rental charge for the properties. *602 Petitioner asserted, at trial, that this recomputation shifted the burden of proof to respondent on this issue. [8]
While the burden of proof is generally on petitioner, it shifts to respondent in the case of a new matter or an increase in the deficiency. Rule 142(a). [9] In the event that respondent asserts a new theory that either alters the original determination or requires the presentation of different evidence, then he has asserted a new matter which requires him to carry the burden of proof thereon. Estate of Falese v. Commissioner,58 T.C. 895, 898-899 (1972); McSpadden v. Commissioner,50 T.C. 478, 492-493 (1968). If, on the other hand, the new theory merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency, it is not a new matter and the burden of proof remains with petitioner. Achiro v. Commissioner,77 T.C. 881, 890 (1981); McSpadden v. Commissioner,supra. *603 Respondent maintains that he has merely recomputed the adjustments he made under section 482 and that such recomputation is in no way inconsistent with the legal theory underlying his original determination. According to respondent, the statutory notice stated, in general terms, that he was relying on section 482 and he has continued to rely on section 482. He insists that his recomputation of the adjustment made pursuant thereto cannot shift the burden of proof to him. We agree with respondent.
The essential purpose of the statutory notice of deficiency is to provide a formal notification to the taxpayer that a deficiency in taxes has been determined. Pietz v. Commissioner,59 T.C. 207 (1972). In the instant case, the statutory notice clearly informed petitioner that respondent had determined a deficiency in taxes pursuant to his authority under section 482. Thus, petitioner was given notice that respondent had determined that he and the partnerships were not dealing at arm's length *604 with the corporations and that some "distribution, apportionment, or allocation" was necessary under section 482. With respect to the 1976 and 1977 taxable years, respondent's recomputation of the adjustments under section 482 has placed no additional burden upon petitioner. Such recomputation will not require the presentation of different evidence because, in any event, petitioner must establish that he and the partnerships were dealing at arm's length with the corporations. Since respondent has not abandoned his original determination, we cannot shift the burden of proof to respondent simply because he has decreased or conceded a portion of the deficiencies for 1976 and 1977. Standard Paving Co. v. Commissioner,13 T.C. 425 (1949), affd. on other grounds 190 F.2d 330 (10th Cir. 1951); but cf. Papineau v. Commissioner,28 T.C. 54 (1957) (where the Court determined that respondent had abandoned his original determination). [10]
With respect to the 1978 taxable year, however, respondent has determined an additional deficiency of $2,837. It is clear *605 that respondent bears the burden of proof with respect to the additional deficiency determined for 1978 and he has so conceded. Nevertheless, except with respect to such increase, there is simply no basis for shifting the burden of proof to respondent on this issue. Petitioner has not alleged that he was in any way surprised or disadvantaged by respondent's recomputation of the adjustments under section 482. See Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973). In conclusion, the taxpayer generally has the burden of proving that respondent's determination under section 482 is arbitrary, unreasonable, or capricious, [11] and under the facts of the instant case, petitioner is not relieved of his burden merely because respondent has recomputed the amounts of the original adjustments he made pursuant to such section. Section 482 provides: In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and *606 whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. Section 482 was enacted to prevent the evasion of taxes through the arbitrary shifting of income between or among two or more related entities. Ach v. Commissioner,42 T.C. 114, 125-126 (1964), affd. 358 F.2d 342 (6th Cir. 1966). Its purpose "is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." Sec. 1.482-1(b)(1), Income Tax Regs. The applicable standard is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Sec. 1.482-1(b)(1), Income Tax Regs.
*607 Respondent has determined that the rents charged by the corporations exceeded an arm's length rental charge and that such excess cannot be deducted by petitioner or the Grandview Garden partnership but must be allocated to the corporations. [12]Section 482 provides respondent with broad discretion in applying such section, and his determinations thereunder may not be reversed unless the taxpayer establishes that such determinations are unreasonable, arbitrary, or capricious. Philipp Brothers Chemicals,Inc. (N.Y.) v. Commissioner,435 F.2d 53, 57 (2d Cir. 1970), affg. 52 T.C. 240 (1960); Ach v. Commissioner,supra.
Section 1.482-2(c)(1), Income Tax Regs., deals with leases of tangible property between controlled taxpayers and authorizes respondent to make allocations to reflect an arm's length charge, stating as follows: Where possession, use, *608 or occupancy of tangible property owned or leased by one member of a group of controlled entities * * * is transferred by lease or other arrangement to another member of such group * * * at a charge which is not equal to an arm's length rental charge * * * the * * * [Commissioner] may make appropriate allocations to properly reflect such arm's length charge. * * * The record firmly establishes that petitioner and the Grandview Garden partnership were not dealing at arm's length with the corporations and that the rents which they paid to lease the apartment complexes did not constitute arm's length charges for such properties. Prior to 1976, petitioner and DeStefano did not even recognize the existence of the corporations for tax purposes, reporting the income and expenses attributable to the operation of the properties as if their partnerships owned them. On or about January 1, 1976, petitioner and DiStefano decided to follow the recommendation of petitioner's accountant, Alexander Varga, and to recognize the corporations' ownership of the apartment complexes for tax purposes. Mr. Varga's testimony indicates that he made this recommendation because he believed that petitioner *609 and DiStefano could obtain the same economic consequences, namely the same tax benefits, by recognizing the corporations' ownership and leasing the apartment complexes to the partnerships that they had obtained by treating the partnerships as the owners.Thus, the rents charged pursuant to the leases did not reflect arm's length rental charges, but were arrived at to maximize the tax benefits from the transactions. Furthermore, once the rents charged by the corporations are compared to the income that the partnership and petitioner earned from such properties, it becomes all too clear that the rents were excessive and would never have been agreed to if the corporations had been uncontrolled entities. Both petitioner and Grandview Garden partnership paid much more rent to lease the Grandview Garden Apartments than they ever collected therefrom. In addition, the rents that petitioner paid for the Villa Verde Apartments in 1976 clearly exceeded the rents that he collected with respect thereto. While the rents that he paid in 1977 and 1978 for the Villa Verde Apartments approximately equalled the rents collected, petitioner was virtually assured of a loss from leasing the apartments *610 after paying the other expenses he would have to incur in connection therewith. On the whole, the record demonstrates that petitioner and DiStefano were not concerned with dealing on an arm's length basis with the corporation, but rather were primarily interested in manipulating the corporation in order to maximize the tax benefits from their dealings therewith.Accordingly, we hold that the rents charged to petitioner and the Grandview Garden partnership were excessive and that respondent properly determined that an allocation under section 482 was necessary to prevent the evasion of taxes.
Section 1.482-2(c)(2)(i), Income Tax Regs., provides that an arm's length rental charge is the amount of rent which was charged or would have been charged for the same or similar property under similar circumstances in independent transactions with or between unrelated parties. It also provides, in pertinent part, that if neither the owner nor the user of the property was engaged in the trade or business of renting property, the arm's length rental charge for the property *611 should be deemed to be equal to an amount determined pursuant to a formula set forth in subdivision (ii) of such subparagraph, unless the taxpayer establishes a more appropriate charge under the standards noted in the previous sentence. An owner or user is considered to be in the trade or business of renting property if "it engages in the trade or business of renting property of the same general type as the property in question to unrelated parties." Sec. 1.482-2(c)(2)(i), Income Tax Regs.
On the record before us, we must sustain respondent's determination of the arm's length rental charges for the properties herein under consideration pursuant to section 1.482-2(c)(2)(ii), Income Tax Regs.[13] Petitioner has never argued that either he or the partnership was in the trade or business of renting property of the same general type as the property in question to unrelated parties. He also failed to offer any evidence whatsoever with respect to the fair rental values of the apartment complexes. Furthermore, there is nothing in the record which indicates that respondent's determination of the arm's length rental charges for the properties *612 pursuant to the regulations was incorrect. [14] Moreover, we have considered all of the arguments raised by petitioner and found them unpersuasive. [15] Finally, we also hold that respondent has met his burden of proof with respect to the increase in deficiency he determined for 1978 in the amount of $2.837. [16]
*613 Issue 2: The Liquidation of Catamount Realty
During 1976, Catamount Realty was liquidated after the sale of the property that it owned. Respondent determined that petitioner realized a long-term capital gain in the amount of $20,465 upon the liquidation of Catamount Realty. According to the statutory notice, respondent computed this gain by allocating to petitioner one-half of the cash that Catamount Realty received upon closing the sale of its property and by treating petitioner as having no basis in his Catamount Realty stock. The parties have since stipulated that petitioner had a basis of $20,245 in his Catamount Realty stock. Nevertheless, respondent now argues that petitioner received $34,185.54 upon the liquidation of Catamount Realty and, therefore, realized a long-term capital gain of $13,940.54 thereon. Respondent's position is based upon the fact that petitioner testified that DiStefano only received $5,135 upon the liquidation and the parties' stipulation to the effect that "after satisfying the corporation's [Catamount Realty's] liabilities, there was cash in the amount of $39,320.54 available for distribution." Petitioner, on the other hand, maintains *614 that both he and DiStefano received only $5,135 each upon liquidation and that the stipulation is incorrect because he overlooked an outstanding liability of approximately $32,000 when he entered the stipulation. According to petitioner, there was only $10,270 which remained to be divided between him and DiStefano after all of the corporation's liabilities had been satisfied.Consequently, petitioner claims that he had long-term capital loss of $15,110 upon the liquidation of Catamount Realty.
While we will not lightly disregard the facts to which the parties have stipulated, see Rule 91(e), we are not bound by the stipulation where the stipulated facts are clearly contrary to the facts disclosed by the record. Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). We believe that this is such a case and that justice requires us to disregard the stipulation. [17]
Both *615 petitioner and his accountant testified that he received only $5,135 upon the liquidation of the Catamount Realty. We found their testimony to be credible and on the basis of such testimony have found as a fact that petitioner only received $5,135 from the liquidation. Furthermore, their testimony is supported by documentary evidence in the record. An exhibit described as a "partial list" of the distribution of the proceeds from the sale of the property owned by Catamount Realty indicates that both petitioner and DiStefano only received $5,135 and that approximately $32,000 was distributed to the Bank of New York to satisfy an outstanding liability. Yet, respondent would have us accept petitioner's testimony only to the extent it indicates that DiStefano received $5,135 from the liquidation. Beyond that, respondent insists that we ignore petitioner's testimony and hold him to stipulation. We are unwilling to do so. Accordingly, we find that petitioner received $5,135 upon the liquidation of Catamount Realty and, therefore, realized a long-term capital loss of $15,110 thereon. Issue 3: Home Office Expenses
*616 Section 280A provides as a general rule that "no deduction * * * shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." Section 280A(c)(1), however, provides the following exceptions to the general rule: (1) CERTAIN BUSINESS USE.--Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis-- (A) as the taxpayer's principal place of business, (B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or (C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business. In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer. Petitioner argues that he is entitled to the claimed home office expense deductions because he used his home office to see patients and to do paperwork in connection with his real estate investments. *617 Nevertheless, petitioner has not proven that he satisfied the explicit requirements of section 280A(c)(1). There is nothing in the record to show that petitioner's home office was exclusively used on a regular basis by his patients. Petitioner simply testified that he used the office to see patients when he happened to be at home and the need to see a patient arose. Unfortunately, we have no way of knowing whether this was more than an occasional occurrence. See Jackson v.Commissioner,76 T.C. 696 (1981). Furthermore, with respect to petitioner's use of his home office in connection with his real estate investment activities, he has failed to establish that such activities rose to the level of a trade or business, or even if they did, that his home office was his principal place of business with respect to those activities. Accordingly, we hold for respondent on this issue. Issue 4: The Deductibility of the Expenses Incurred to Attend the Seminar in South America
Although petitioner concedes that he is not entitled to a deduction for that portion of the trip's cost which is allocable to his wife and son, he still insists that he is entitled to *618 deduct his allocable portion of the costs as a continuing education expense. Respondent, on the other hand, maintains that petitioner is not entitled to any deduction for the trip because he has failed to meet the requirements of section 274(h).[18] We agree with and hold for respondent. [19]
*619 Section 274(h) sets forth special rules governing the deductibility of expenses incurred in connection with foreign conventions. The term "foreign conventions" is defined as any "convention, seminar, or similar meeting held outside the United States, its possessions, and the Trust Territory of the Pacific." Sec. 274(h)(6)(A). Petitioner appears to have failed to satisfy a number of the requirements set forth under section 274(h). Since it is clear, however, that he did not comply with the provisions of section 274(h)(7), we need go no further. Pursuant to section 274(h)(7), no deductions shall be allowed for the transportation or subsistence expenses incurred to attend a foreign convention unless the taxpayer attaches to the return on which he claims the deduction (1) a written statement signed by the individual attending the convention on which he sets forth the total days of the trip (excluding days of transportation to and from the convention), the number of hours of each day which the individual devoted to scheduled business activities, and a program of the scheduled business activities *620 of the convention and (2) a written statement signed by an officer of the organization or group sponsoring the convention setting forth a schedule of the business activities of each day of the convention and the number of hours which the individual attending the convention attended such activities. Since petitioner did not attach the necessary statements to his return, we must sustain respondent's determination. [20]
Issue 5. Automobile Expenses
Petitioner maintains that he is entitled to automobile expense deductions in excess of the amounts allowed by respondent. At trial, petitioner testified that he told his accountant how many miles he drove his automobile for business purposes each year and that his accountant determined his automobile expense deduction pursuant to the standard mileage rate set by the Internal Revenue Service. This was the only proof that petitioner presented with respect to this issue. On the basis of the record before us, we must hold for respondent on this issue. We simply have no way of knowing, as argued by respondent, whether petitioner's definition of the business *621 use of his automobile includes nondeductible commuting expenses. The evidence that petitioner presented on this issue is too sparse for us to find that he is entitled to deductions in excess of those allowed by respondent. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
*. This case was tried before Judge Sheldon V. Ekman, who died on January 18, 1982. It was reassigned to Judge Lapsley W. Hamblen, Jr.↩, for disposition by Order of the Chief Judge.
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
2. Respondent completely disallowed the office expense deductions claimed for 1977 and 1978, but disallowed only $588 of the office expense deduction claimed for 1976. While this is not explained in the notice of deficiency, it is reasonable to assume that only $588 of the claimed office expense deduction for 1976 was allocable to petitioner's home office.↩
3. Once again, the record indicates that petitioner and DiStefano did not recognize the corporation for tax purposes and treated the Catamount partnership as the owner of the property.↩
4. At or about the same time, the Catamount partnership was dissolved.↩
5. Consistent with their failure to recognize the corporation for tax purposes, petitioner and DiStefano reported the gain realized from the sale of the farm owned by Catamount Realty on the return filed for the Catamount partnership. Oddly enough, however, they also reported this sale on the corporate return filed for Catamount Realty, but claimed nonrecognition treatment because the sale was made pursuant to a sec. 337 liquidation. Petitioner did not report any gain from the liquidation of Catamount Realty.↩
6. In the amended answer, respondent determined pursuant to sec. 1.482-2(c), Income Tax Regs., that for 1978 the amount that petitioner paid to the corporations for the Villa Verde and Grandview Garden Apartments exceeded the fair rental value thereof by $33,452 and, accordingly, increased petitioner's taxable income and his deficiency for 1978 by $5,747 and $2,837, respectively. For 1976 and 1977, respondent's recomputation of the sec. 482↩ adjustments to petitioner's income will decrease the amounts of the deficiencies.
7. In his amended answer, respondent stated that the fair rental value of the Grandview Garden Apartments for 1978 was $46,770. Respondent has since indicated, however, that the fair rental value of the property, as computed under sec. 1.482-2(c), Income Tax Regs.↩, was $50,299.
8. Petitioner never presented any detailed arguments in support of this assertion either at trial or on brief.↩
9. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
10. See also Dees v. Commissioner,T.C. Memo. 1962-153↩.
11. See Achiro v. Commissioner,77 T.C. 881, 891↩ (1981).
12. It is clear that we have "organizations, trades, or businesses" owned or controlled by the same interests, and petitioner has not argued otherwise.↩
13. In Fegan v. Commissioner,71 T.C. 791 (1979), affd.     F.2d     (10th Cir. 1981, 81-1 USTC par. 9436), this Court upheld the validity of sec. 1.482-2(c), Income Tax Regs.↩
14. Although petitioner has submitted his own computation pursuant to sec. 1.482-2(c)(2)(ii), Income Tax Regs.↩, which varies markedly from respondent's computations, such computation is virtually incomprehensible, is clearly incorrect in certain respects, and is wholly unsupported by the record before us. 15. Relying on Roccaforte v. Commissioner,77 T.C. 263 (1981), petitioner asserted, on brief, that the corporations, i.e., HAE and DH, were merely acting as agents in holding legal title to the apartment complexes. Petitioner's position is somewhat confusing because he has raised this argument to support the rent deductions claimed by him and the partnership. Nevertheless, upon considering this argument, it is evident that petitioner's reliance on Roccaforte is misplaced. Under the standards enunciated in Roccaforte,↩HAE and DH cannot qualify as agents. Although DH's certificate of incorporation provided that upon completion title to the Grandview Garden Apartments would be transferred to a general partnership when construction was completed, no such transfer ever occurred. Indeed, petitioner and DiStefano recognized that the corporations owned the apartment complexes when they arranged for the partnerships to lease them from the corporations in 1976. Such conduct is clearly inconsistent with an agency relationship. 16. We have already found that the record establishes that the rents charged by the corporations were not arm's length charges and respondent has determined deemed arm's length rental charges for the properties pursuant to sec. 1.482-2(c)(2)(ii), Income Tax Regs. Under these circumstances, we believe that respondent has established a prima facie case, and that the burden of going forward with the evidence has shifted to petitioner. See Papineau v. Commissioner,28 T.C. 54↩ (1957). Since petitioner failed to present any evidence regarding the fair rental values of the properties, we hold for respondent regarding the increased deficiency he determined for 1978. Furthermore, even if we had decided that the burden of proof on this issue had shifted to respondent for the entire deficiency for each of the years before us, we would, for the same reasons, be constrained to hold for respondent on this issue.
17. At trial, petitioner's counsel stated that he would stand by the stipulation.Upon reviewing the entire transcript, it is clear that this was a misstatement to which we shall not bind petitioner.↩
18. Sec. 274(h), as originally enacted, applied to conventions beginning after December 31, 1976, and provided, in part, as follows: (h) FOREIGN CONVENTIONS.-- (1) DEDUCTIONS WITH RESPECT TO NOT MORE THAN 2 FOREIGN CONVENTIONS PER YEAR ALLOWED.--If any individual attends more than 2 foreign conventions during his taxable year-- (A) he shall select not more than 2 of such conventions to be taken into account for purposes of this subsection, and (B) no deduction allocable to his attendance at any foreign convention during such taxable year (other than a foreign convention selected under subparagraph (A)) shall be allowed under section 162 or 212. (2) DEDUCTIBLE TRANSPORTATION COST CANNOT EXCEED COST OF COACH OR ECONOMY AIR FARE.--In the case of any foreign convention, no deduction for the expenses of transportation outside the United states to and from the site of such convention shall be allowed under section 162 or 212 in an amount which exceeds the lowest coach or economy rate at the time of travel charged by a commercial airline for transportation to and from such site during the calendar month in which such convention begins. If there is no such coach or economy rate, the preceding sentence shall be applied by substituting "first class" for "coach or economy". (3) TRANSPORTATION COSTS DEDUCTIBLE IN FULL ONLY IF AT LEAST ONE-HALF OF THE DAYS ARE DEVOTED TO BUSINESS RELATED ACTIVITIES.--In the case of any foreign convention, a deduction for the full expenses of transportation (determined after the application of paragraph (2)) to and from the site of such convention shall be allowed only if more than one-half of the total days of the trip, excluding the days of transportation to and from the site of such convention, are devoted to business related activities. If less than one-half of the total days of the trip, excluding the days of transportation to and from the site of the convention, are devoted to business related activities, no deduction for the expenses of transportation shall be allowed which exceeds the percentage of the days of the trip devoted to business related activities. (4) DEDUCTIONS FOR SUBSISTENCE EXPENSES NOT ALLOWED UNLESS THE INDIVIDUAL ATTENDS TWO-THIRDS OF BUSINESS ACTIVITIES.--In the case of any foreign convention, no deduction for subsistence expenses shall be allowed except as follows: (A) a deduction for a full day of subsistence expenses while at the convention shall be allowed if there are at least 6 hours of scheduled business activities during such day and the individual attending the convention has attended at least two-thirds of these activities, and (B) a deduction for one-half day of subsistence expenses while at the convention shall be allowed if there are at least 3 hours of scheduled business activities during such day and the individual attending the convention has attended at least two-thirds of these activities. Notwithstanding subparagraphs (A) and (B), a deduction for subsistence expense for all of the days or half days, as the case may be, if [of] the convention shall be allowed if the individual attending the convention has attended at least two-thirds of the scheduled business activities, and each such full day consists of at least 6 hours of scheduled business activities and each such half day consists of at least 3 hours of scheduled business activities. (5) DEDUCTIBLE SUBSISTENCE COSTS CANNOT EXCEED PER DIEM RATE FOR UNITED STATES CIVIL SERVANTS.--In the case of any foreign convention, no deduction for subsistence expenses while at the convention or traveling to or from such convention shall be allowed at a rate in excess of the dollar per diem rate for the site of the convention which has been established under section 5702(a) of title 5 of the United States Code and which is in effect for the calendar month in which the convention begins. (6) DEFINITIONS AND SPECIAL RULES.--For purposes of this subsection-- (A) FOREIGN CONVENTION DEFINED.--The term "foreign convention" means any convention, seminar, or similar meeting held outside the United States, its possessions, and the Trust Territory of the Pacific. (B) BUSISTENCE EXPENSES DEFINED.--The term "subsistence expenses" means lodging, meals, and other necessary expenses for the personal sustenance and comfort of the traveler. Such term includes tips and taxi and other local transportation expenses. (7) REPORTING REQUIREMENTS.--No deduction shall be allowed under section 162 or 212 for transportation or subsistence expenses allocable to attendance at a foreign convention unless the taxpayer claiming the deduction attaches to the return of tax on which the deduction is claimed-- (A) a written statement signed by the individual attending the convention which includes-- (i) information with respect to the total days of the trip, excluding the days of transportation to and from the site of such convention, and the number of hours of each day of the trip which such individual devoted to scheduled business activities, (ii) a program of the scheduled business activities of the convention, and (iii) such other information as may be required in regulations prescribed by the Secretary * * *. ↩
19. Respondent also argued that petitioner is not entitled to any deduction for the trip under sec. 162. Since we have found that petitioner failed to satisfy the requirements of sec. 274(h)↩, we need not address respondent's alternative argument.
20. See Callo v. Commissioner,T.C. Memo, 1982-712↩.